UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
MAR 2 2 2010
U.S.D.C. S.D. N.Y.
CASHIERS

| IN RE AMERICAN EXPRESS ERISA LITIGATION | MASTER FILE: 08-CV-10834 (JGK) |
|---|---|
| THIS DOCUMENT RELATES TO: All Actions | |

## SECOND CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiffs Renee Obester, Kam K. Tang, Charlotte Fairclough, and Ida DiLorenzo (collectively, "Plaintiffs") allege the following based upon personal information as to themselves and the investigation of Plaintiffs' counsel, which includes, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by American Express Company ("American Express" or the "Company"), including the Company's proxy statements (Forms DEF-14A), annual reports (Forms 10-K), quarterly reports (Forms 10-Q), current reports (Forms 8-K), and the annual reports (Forms 11-K) filed on behalf of the American Express Retirement Savings Plan (formerly known as the American Express Incentive Savings Plan) (the "Plan"); a review of the Forms 5500 filed by the Plan with the U.S. Department of Labor ("DOL") and U.S. Department of the Treasury; interviews with former employees of the Company; and a review of available documents governing the operations of the Plan.

## I.    NATURE OF THE ACTION

1.    This action is brought on behalf of the Plan and all Plan participants to recover losses to the Plan for which Defendants are personally liable pursuant to Sections 409 and 502(a)(2) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek other

equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

2.     The Plan (as further described herein) is a 401(k) retirement plan sponsored by the Company to provide Plan participants an easy and convenient way to save toward their retirement.

3.     Plaintiffs' claims arise from the failure of Defendants, who were or are fiduciaries of the Plan, to act solely in the interest of the Plan and its participants and beneficiaries and to exercise the required skill, care, prudence, and diligence in administering the Plan and its assets during the period from April 19, 2007, to the present (the "Class Period").

4.     Throughout the Class Period, Defendants allowed the Plan to acquire and hold American Express common stock ("Company Stock") through the American Express Company Stock Fund (the "Company Stock Fund"), which invested primarily in Company Stock, even though Defendants knew or should have known that Company Stock was an imprudent means of saving for retirement.  Company Stock was not a prudent retirement asset for the Plan or participants' accounts because, throughout the Class Period, American Express was exposed to huge financial losses and diminution in the value of the Company Stock as a result of being heavily dependent on consumer credit card spending while the economy was weakening and while nationwide consumer credit card spending was sharply declining.  American Express was also exposed to huge financial losses because of its own poor underwriting practices prior to and during the Class Period, including extending credit cards to persons with multiple mortgages and assuming a substantial and increased exposure to credit card customers in California and Florida, markets which have been the epicenter of the housing market collapse in the United States. These factors have led to the market price of the Company Stock being artificially inflated

during the Class Period and have led to massive losses to the Plan and for its participants and beneficiaries.

5.      Even after Defendants amended the Plan to prevent its participants and beneficiaries from allocating more than 10% of the overall balance in their retirement accounts to the Company Stock Fund, when Defendants knew or should have known that Company Stock was an imprudent means of saving for retirement, Defendants nonetheless failed to reduce Plan assets allocated to the Company Stock Fund to the 10% restriction.

6.      On May 2, 2008, American Express admitted that declines in card member spending and weaker credit trends had negatively impacted its heavily concentrated credit business.  It further admitted for the first time that, notwithstanding its prior expressions that it was on track for further growth, such credit declines would prevent the Company from meeting its EPS guidance for the full year 2008.  The Company's financial business has since collapsed to the point where it was compelled to become a licensed bank-holding company on November 10, 2008 and ended up in dire need of $3.39 billion in aid from the U.S. Treasury's bank bailout fund.

7.      Amidst the financial collapse during the Class Period, the value of the Company Stock has plummeted approximately 69% from a trading price of $58.50 per share on April 19, 2007 to a closing price of $18.42 per share on December 22, 2008, a loss that has significantly reduced the overall value of the Plan's assets and Plan participants' vested retirement benefits.

8.      Plaintiffs' claims arise from the failure of Defendants to act solely in the interest of the Plan participants, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period as required by ERISA.

9.      Accordingly, Plaintiffs allege in Count I that certain Defendants, each having certain responsibilities regarding the management and investment of Plan assets in accordance with the documents and instruments governing the Plan insofar as such documents and instruments are consistent with the provisions of ERISA, breached their fiduciary duties to the Plan and Plan participants under ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), by failing to limit ongoing and aggregate contributions to the Company Stock Fund to no more than 10% of participants' retirement account balances.

10.      Plaintiffs allege in Count II that certain Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to the Plan and Plan participants under ERISA § 404(a)(1)(B), by failing to prudently and loyally manage the Plan's retirement assets by, among other things, (a) continuing to offer Company Stock as a retirement saving option; (b)  continuing to acquire and hold shares of Company Stock in the Plan when it was imprudent to do so; (c) failing to provide complete and accurate information to Plan participants regarding the Company's financial condition and the prudence of investing in Company stock; (d) maintaining the Plan's pre-existing Company Stock holding when Company Stock was no longer a prudent retirement asset for the Plan; and (e) knowingly participating in or undertaking to conceal to other Defendants' failure to disclose crucial information regarding the Company's operations and artificial inflation of the Company Stock.

11.      Defendants' actions and inactions with respect to Counts I and II conflicted with the express purpose of ERISA retirement plans, which is to help provide funds for participants' retirement.  *See* ERISA § 2, 29 U.S.C. § 1001 ("Congressional Findings And Declaration Of Policy").

12.     In Count III, Plaintiffs allege that certain Defendants failed to adequately inform the Plan's participants about the true risk and return characteristics of the Company Stock as required by ERISA.

13.     In Count IV, Plaintiffs allege that the Monitoring Defendants (defined below) breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering Company Stock as a retirement savings option and holding Plan assets in Company Stock when it was no longer prudent to do so.

14.     In Count V, Plaintiffs allege that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and its participants' best interests in mind.

15.     As alleged below, Defendants responsible for selecting and monitoring the Plan's retirement savings options imprudently permitted the Plan to offer, acquire, and hold Company Stock during the Class Period despite the Company's serious mismanagement, improper business practices, and dire financial circumstances.  Defendants' breaches have caused the Plan and its participants to suffer millions of dollars in losses of retirement savings.

16.     ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), authorize participants, such as Plaintiffs, to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty.  Pursuant to that authority, Plaintiffs bring this action as on behalf of the Plan and as a class action under Fed. R. Civ. P. 23 on behalf of all participants in the Plan whose Plan accounts were invested in the Company Stock Fund during the Class Period.

## II.     JURISDICTION AND VENUE

17.     The Court has subject-matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 1331.

18.     ERISA provides for nationwide service of process.  ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All Defendants are either residents of the United States or subject to service in the United States.  Therefore, the Court has personal jurisdiction over them.  The Court also has personal jurisdiction over Defendants pursuant Fed. R. Civ. P. 4(k)(1)(A) because Defendants are all subject to the jurisdiction of a court of general jurisdiction in the State of New York.

19.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and American Express has its principal place of business in this District.

## III.    PARTIES

### A.     Plaintiffs

20.     Plaintiff Renee Obester is a participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Company Stock in her individual Plan account during the Class Period.

21.     Plaintiff Kam K. Tang is a participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Company Stock in his individual Plan account during the Class Period.

22.     Plaintiff Charlotte Fairclough is a participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Company Stock in her individual Plan account during the Class Period.

23.     Plaintiff Ida DiLorenzo is a participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Company Stock in her individual Plan account during the Class Period.

**B.     Defendants**

24.     All Defendants named below are fiduciaries of the Plan within the meaning of ERISA, and all Defendants breached their fiduciary duties in various ways, as is alleged herein.

**1.     The Company**

25.     Defendant American Express is a New York corporation headquartered at World Financial Center, 200 Vesey Street, 50th Floor, New York, New York 10285.  During the Class Period, the Company Stock traded on the New York Stock Exchange under the ticker symbol "AXP."  As of February 29, 2008, the Company had 1,157,739,894 shares of Company Stock.

26.     American Express is a global network, payments, and travel company that provides charge and credit payment card products, and travel-related services worldwide.  It operates in two groups, the Global Consumer Group and the Global Business-to-Business Group. The Global Consumer Group offers a range of products and services, including charge and lending card products, consumer travel services, and stored value products, such as Travelers Cheques and prepaid products.  The Business-to-Business Group provides business travel, and corporate cards and other expense management products and services; network services and merchant acquisition, and merchant processing for the company's network partners and proprietary payments businesses; and point-of-sale, back-office, and marketing products and services for merchants.

27.     According to the Company's Form 5500 filed with the Department of Labor and the Internal Revenue Service for the fiscal plan year beginning October 1, 2005 and ending on September 30, 2006 (the "Form 5500"), American Express is the Sponsor of the Plan.

2.    **Director Defendants**

28.    Defendant Kenneth I. Chenault ("Chenault") has served as Chairman of the Company's Board of Directors (the "Board") since April 2001, as its Chief Executive Officer since January 2001, and as a director since January 2001.  Chenault was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

29.    Defendant Daniel F. Akerson ("Akerson") has served as a director since 1995. Akerson was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

30.    Defendant Charlene Barshefsky ("Barshefsky") has served as a director since 2001.  Barshefsky was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that she exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

31.    Defendant Ursula M. Burns ("Burns") has served as a director since 2004.  Burns was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that she exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

32.    Defendant Peter Chernin ("Chernin") has served as a director since 2006. Chernin was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

33.     Defendant Jan Leschly ("Leschly") has served as a director since 1997.  Leschly was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that she exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

34.     Defendant Richard C. Levin ("Levin") has served as a director since 2007.  Levin was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

35.     Defendant Richard A. McGinn ("McGinn") has served as a director since 2003. McGinn was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

36.     Defendant Edward D. Miller ("Miller") has served as a director since 2003. Miller was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

37.     Defendant Steven S. Reinemund ("Reinemund") has served as a director since 2007.  Reinemund was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

38.     Defendant Robert D. Walter ("Walter") has served as a director since 2002. Walter was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

39.     Defendant Ronald A. Williams ("Williams") has served as a director since 2007. Williams was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

40.     Defendants Chenault, Akerson, Barshefsky, Burns, Chernin, Leschly, McGinn, Miller, Reinemund, Walter, and Williams are collectively referenced herein as the "Director Defendants" and sometimes as the "Monitoring Defendants."

41.     At all relevant times, the Director Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets.

42.     The Board was ultimately responsible for monitoring and administering the Plan. Because of their positions as directors of the Company, the Director Defendants had access to material, non-public information concerning Lehman, including the Company's true financial condition and outlook.  The Board had a responsibility to carry out its duties in such a manner as to best serve the interests of the Plan's participants.

43.     According to the *Code of Business Conduct for Members of the Board of Directors of American Express Company,* "Directors shall comply with all applicable laws, rules and regulations applicable to the Company" and "should promote ethical behavior and take steps to ensure that the Company:   (a) encourages employees to report violations of laws, rules, regulations of the Company's Code of Conduct to appropriate personnel; (b) encourages

employees to talk to supervisors, managers and other appropriate personnel when in doubt about the best course of action in a particular situation and (c) has a "whistle blower" policy that assures employees that the Company will not retaliate for reports made in good faith."

### 3.    The Compensation Committee Defendants

44.    At all relevant times, Defendants Leschly, as Chair, McGinn, Miller, Walter and Chernin served as members of the Board's Compensation and Benefits Committee (the "Compensation Committee").  According to the Form 11-K filed by the Company with the SEC on July 15, 2008 ("2008 11-K"), the Compensation Committee appointed members of the Employee Benefits Administration Committee.  *See* 2008 11-K at 4.

45.    Under the American Express Company Compensation and Benefits Committee Charter (as amended and restated as of April 23, 2007) (the "CBC Charter"), the Compensation Committee "has the authority of the Company's Board of Directors (the "Board") with respect to . . . the employee benefit plans of the Company (as such types of plans are defined [under ERISA]) . . . ."  CBC Charter at 1.[1]  Pursuant to the CBC Charter, the Compensation Committee's responsibilities include, among other things, "[a]ppointing the membership of the Benefits Plans Investment Committee, which together with the Employee Benefits Administration Committee and the Incentive Savings Plan Investment Committee serve as the named fiduciaries of the Company's employee benefit plans subject to ERISA, and of other committees as needed."  CBC Charter at 2.

---

[1] A true and correct copy of the CBC Charter is annexed hereto as Exhibit A.

11

4.      **The Administration Committee Defendants**

46.     Defendant Employee Benefits Administration Committee ("Administration Committee") is a named fiduciary of the Plan.  *See* 2007 & 2008 Plans § 10.1;[2] Employee Benefits Administration Committee Charter (the "EBAC Charter") at 1.[3]  The Administration Committee consisted of various officers and employees of the Company charged with the operation and administration of the Plan.  *See* 2007 & 2008 Plans §§ 10.1, 10.3(a).

47.     At all relevant times, the Administration Committee possessed the power, duty and complete and exclusive discretion to, *inter alia*:

a.      Administer the Plan and to establish such rules and regulations in connection therewith as it determines to be necessary or appropriate in the circumstances;

b.      Conclusively make all determinations necessary for the administration of the Plan, including without limitation determinations as to eligibility to participate and eligibility for benefits;

c.      Construe, interpret, and supplement the Plan whenever necessary to carry out its intent and purpose and to facilitate the Plan's administration;

d.      Decide any claims arising out of or related to a denial of Plan benefits or the administration or operation of the Plan or the investment of Plan assets, including but not limited to claims for benefits, participation rights and breach of fiduciary

---

[2] A true and correct copy of the American Express Retirement Savings Plan (2007 amendment and restatement) (the "2007 Plan") is annexed hereto as Exhibit B.  A true and correct copy of the American Express Retirement Savings Plan (2008 amendment and restatement) (the "2008 Plan") is annexed hereto as Exhibit C.

[3] A true and correct copy of the EBAC Charter is annexed hereto as Exhibit D.

duty under ERISA Section 502, provide bonding of all fiduciaries, Plan officials and other similar persons at least to the extent required by ERISA; and

e.    Prepare, file with the appropriate government agency, furnish or make available to appropriate Participants, alternate payees, and beneficiaries, the various statements, reports, descriptions, registrations and other documents all as required by ERISA, or cause such filings to be prepared and made.

*Id.,* § 10.3(a).

48.    As set forth in the Administration Committee Charter, the powers and duties of the Administration Committee include the following:

a.    Fulfills the duties imposed on plan administrators by ERISA, including the filing of annual reports (when required), responding to participant requests for information, and providing mandatory notices and disclosure documents (such as summary plan descriptions and benefit statements);

b.    Can establish, amend and terminate administrative rules and procedures;

c.    Oversees the benefit claims process, and decides claims and appeals in accordance with regulatory requirements;

d.    Oversees operation of the plans in compliance with the terms of the plan documents and applicable law, and has the requisite powers to carry out such responsibility, whether granted expressly under the terms of the plans or implied by reason of being necessary or appropriate for proper administration;

e.    Employs or retains such accounting, legal, and clerical services as it may determine to be necessary or appropriate for the proper discharge of its functions;

13

f.    Appoints one or more independent fiduciaries or other independent service providers to provide such services and perform such functions in furtherance of the Committee's duties and responsibilities as the Committee in its discretion determines;

g.    Has full access to any relevant records of the Company and may request any employee of the Company or other person to meet with the Committee or its consultants;

h.    Has the authority to delegate all or a portion of its duties and authority to one or more of the Committee members, senior executives or committees, or other appropriate persons, subject to applicable plan terms, laws and regulations; and

i.    Can approve clerical amendments to the plans it administers.

EBAC Charter at 1.

49.    Defendant Valeria Christensen ("Christensen") is a member of the Administration Committee.  Defendant Christensen signed the 2008 11-K on behalf of the Administration Committee.  Defendant Christensen also signed the Form 5500 as the individual signing as the Plan Administrator.

50.    Because Plaintiffs are currently unaware of the true identities and capacities of the remaining members of the Administration Committee, those individuals, are collectively named as John Does 1-10.  Plaintiffs will substitute the real names of the John Does 1-10 when they are known to Plaintiffs.

### 5.    The Investment Committee Defendants

51.    Defendant Retirement Savings Plan Investment Committee ("Investment

Committee"), formerly known as the Incentive Savings Plan Investment Committee, is a named

fiduciary of the Plan.  *See* 2007 & 2008 Plans § 10.1.[4]  Subject to the terms of the Plan requiring

that the Company Stock Fund be offered as a retirement savings option, the Investment

Committee has the "fiduciary responsibility to monitor the investment of the Plan's assets solely

in the interests of the Plan's participants and beneficiaries."  Statement of Investment Objectives,

Policies and Guidelines ("SIO") at 2 & 3;[5] 2007 & 2008 Plan §§ 6.2(a) & 10.4.

52.     Thus, at all relevant times, the Investment Committee possessed the power, duty

and complete and exclusive discretion to, *inter alia*:

a.     Select the Discretionary Funds that are from time to time to be offered as
investment options under the Plan, and take such measures as it determines to be
necessary or advisable to monitor the performance of each such Discretionary
Fund;

b.     Prepare and submit periodic reports summarizing the assets, liabilities and
investment performance of the Plan;

c.     Maintain such records as it determines necessary or advisable to discharge its
duties under the Plan; and

d.     In its discretion, appoint one or more independent fiduciaries (including, without
limitation, investment advisers) or other independent service providers to provide
such services and perform such functions in furtherance of the Investment
Committee's duties and responsibilities under the Plan as the Investment
Committee in its discretion determines, any such appointed fiduciary or other
service provider to have such powers and authority (otherwise exercisable by the
Investment Committee), other than the authority to appoint other fiduciaries, as
the Investment Committee determines.

2007 & 2008 Plans § 10.4.

---

[4]  The American Express Retirement Savings Plan was formerly known as the American Express
Incentive Savings Plan.  *Id.* § 1.1.  The name change in the Plan became effective July 1, 2007.  See Form
11-K filed June 29, 2007 ("2007 11-K") at 4.

[5]  A true and correct copy of the SIO is annexed hereto as Exhibit E.

53.     As set forth in the <mark>SIO</mark>, the Investment Committee is responsible for the following:

    a.    Developing an investment program that offers a diversified range of funds;

    b.    Establishing appropriate investment objectives, guidelines and performance standards related to investment options were appropriate;

    c.    Monitoring the performance of the investment fund managers with respect to their management of assets; and

    d.    Monitoring the investment program to ensure that it provides a diversified range of investments offering a range of risk levels across a variety of asset classes.

<mark>SIO</mark> at 3-4.

54.     Pursuant to the <mark>SIO</mark>, the investment managers will be responsible for, *inter alia*, [m]anaging the assets in accordance with the investment policy and guidelines as expressed in the fund prospectus or management agreement with the Plan." *Id.* at 5.[6]

55.     The "'Investment Consultant' will work with the [Investment] Committee to evaluate the investment performance of ***all*** investment options." *Id.* (emphasis added). Accordingly, the Investment Consultant will:

    a.    Advise the Investment Committee as to the continuing appropriateness of each investment option;

    b.    Recommend modifications to the Investment Committee regarding the overall investment program including objectives, guidelines or performance standards for each investment option, and inform the Investment Committee regarding current investment trends and issues.

    c.    *Id.* (emphasis added).

56.     Notwithstanding the foregoing, in the absence of "extraordinary circumstances," the Investment Committee would not and did not monitor the performance of the Company

---

[6] Under the Plan, "Investment Manager" is defined as "the person, persons, firm or corporation, if any, other than the Trustee, appointed by the Investment Committee to direct the investment of all or any part of the Trust Fund, provided that any person so appointed shall qualify as an 'Investment Manager' for the purposes of ERISA." <mark>2007 and 2008 Plans</mark> § 2.38.

Stock for the purpose of recommending levels of Company Stock as a retirement asset for the Plan or for the elimination of Company Stock as a Plan asset. *Id.* at 9.

57.     The members of the Investment Committee are described in the Plan document as "individuals holding the following job titles (or successor titles thereto)":

| | | |
|---|---|---|
| a. | Vice President and Assistant Treasurer: | Not presently known |
| b. | Senior Vice President of Human Resources: | Not presently known |
| c. | Vice President of Treasury: | Not presently known |
| d. | Vice President of Global Benefits: | Jim Dwyer |
| e. | Executive Vice President of Operations: | Not presently known |

*See* 2007 & 2008 Plan § 10.1.

58.     Therefore, upon information and belief, Defendant Dwyer and at least four other individuals constitute the membership of the Investment Committee.

59.     Because Plaintiffs are currently unaware of the true identities and capacities of the remaining unnamed members of the Investment Committee, those individuals, are collectively named as John Does 11-15.  Plaintiffs will substitute the real names of the John Does 11-15 when they are known to Plaintiffs.

### 6.     Defendant Dwyer

60.     Defendant Jim Dwyer ("Dwyer") joined the Company in 1991 and, at all relevant times, has served as the Company's Vice President of Global Benefits.  As vice president of global employee benefits, retirement plans, and health services, Dwyer has been responsible for the strategy, design funding, and communication of employee benefits for the Company's employees and family members.  Dwyer also signed the Form 5500 as the individual signing as the Plan Sponsor.

IV.     **THE PLAN**

61.     The Plan is an employee pension benefit plan, as defined by ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(2)(3) and 1002(2)(A).  The Plan is a "defined contribution plan" or "individual account plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that separate individual Plan accounts are maintained for each participant based upon the amount contributed to each participant's account.  The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).

62.     The assets of an employee benefit plan, such as the Plan here, must be "held in trust by one or more trustees."  ERISA § 403(a), 29 U.S.C. § 1103(a).  During the Class Period, the assets of the Plan were held in trust by successive Plan Trustees and Record keepers, Ameriprise Trust Company ("Ameriprise") and Wachovia Bank, National Association ("Wachovia").  *See* American Express Incentive Savings Plan Trust Agreement ("Trust Agreement") at 1;[7] Consent, Resignation & Appointment of American Express Incentive Savings Plan ("CR&A") at 1.[8]

63.     The Plan was originally adopted effective June 11, 1973.  *See* 2007 & 2008 Plans § 1.1.

64.     On or about December 1, 1994, the American Express Stock Ownership Plan (the "SOP") merged with the Plan, and all assets and liabilities of the SOP were transferred to the Plan.  *Id.*; *see* Summary Plan Description ("SPD") at 20.[9]

---

[7] A true and correct copy of the Trust Agreement is annexed hereto as Exhibit F.

[8] In April 2007, Ameriprise resigned as Plan Trustee and later replaced by Wachovia.  *Id.*

[9] A true and correct copy of the SPD, dated May 1, 2008, is annexed hereto as Exhibit G.

65.     On or about April 4, 2002, the assets of the Company Stock Fund were designated as a stock bonus plan comprising of an employee stock ownership plan (the "ESOP").  *See* Plan § 1.1; SPD at 26.

66.     Certain provisions of the Plan were amended, effective July 1, 2007.  *See* 2007 Plan § 1.2; American Express Incentive Savings Plan Summary of Material Modification, dated April 27, 2007 ("SMM") at 1.[10]   The Plan was subsequently amended and restated effective January 1, 2008.  *See* 2008 Plan § 1.2.

67.     As of July 1, 2007, the ESOP principally held Company Stock for Plan participants maintaining retirement assets in the Company Stock Fund.  2007 Plan §§ 17.2; 17.5; SPD at 27.

68.     The purpose of the Plan is to serve as a "source of supplemental retirement income for Plan participants and their beneficiaries."  SIO at 1.  Consequently, Defendants were required to manage the Plan and Plan assets conservatively and solely in the interests of the Plan's participants and beneficiaries.

69.     Under the Plan, regular full-time and certain part-time employees were and are eligible to make elective contributions to the Plan beginning as soon as practicable after their date of hire.  *See* 2007 & 2008 Plans § 3 *et seq.*; SPD at 7.  Further, they are eligible to receive Company matching contributions and profit sharing contributions upon completion of one year of service.  *See* 2007 & 2008 Plans § 3 *et seq.*; SPD at 7 and 8.

70.     Moreover, at each pay period, Plan participants may elect to make before-tax contributions, after-tax contributions (up to 10%), or a combination of both, not to exceed 80%

---

[10] A true and correct copy of the SMM is annexed hereto as Exhibit H.

of their compensation to the Plan through payroll deduction.  *See* 2007 & 2008 Plans § 4.3; SPD at 4.  In addition, American Express matches, dollar-for-dollar, a percentage of participants' before-tax contributions on a quarterly basis, up to 5% of compensation upon a participant's completion of one year of service.  *See* 2007 & 2008 Plans § 4.2; SPD at 5.[11]  Profit sharing contributions are also awarded to certain participants in the amount of 0-5% of the participant's compensation at American Express' discretion based, in part, on American Express' performance.  *See* 2007 & 2008 Plans §§ 4.6 & 4.11; SPD at 5.[12]

71.     A Plan participant may elect to allocate contributions to any combination of funds and to change retirement savings elections for future contributions on any business day that the NYSE is open.  *See* 2007 & 2008 Plans §§ 6.1-6.3; SPD at 23.  The retirement funds available under the Plan include the Company Stock Fund, five Core Investment Funds, Retirement Funds, the Self-Managed Brokerage Account, and the Ameriprise Stock Fund (dissolved as of April 24, 2007).  *See* 2007 & 2008 Plans §§ 6.1-6.3; SPD at 26-33.

72.     The Plan has acquired and held Company Stock through the Company Stock Fund.  The Company Stock Fund consists exclusively of (i) shares of Company Stock and (ii) such cash or short-term fixed income investments.  *See* 2007 & 2008 Plans § 6.2; SPD at 26 & 27.

73.     At all relevant times, the Plan provided for the Company Stock Fund as a retirement savings option.  *See* American Express Pooled Stock Services Agreement, dated

---

[11] Under the prior Plan, the Company matches participants' before-tax contributions quarterly on a dollar for dollar basis up to 3% of compensation.  *See* 2007 11-K at 4.

[12] Under the prior Plan, profit sharing contributions were awarded in a range of 0-7% of compensation.  *See* 2007 11-K at 5.

August 25, 2005 ("PSSA"),[13] § J; *See* 2007 & 2008 Plans § 6.2; SPD at 23. However, the fiduciary duties of prudence and loyalty imposed by ERISA do not allow the offering of imprudent retirement assets in any retirement plan, and these duties trump the terms of any plan to the contrary.

74.     During the early part of the Class Period (until July 1, 2007), Plan participants were not restricted as to the percentage of their Plan contributions they could allocate to the Company Stock Fund in the Plan. In fact, Plan participants were able to allocate 100% of their Plan contributions to the Company Stock Fund. *See* SMM at 6.

75.     Equally notable, prior to July 1, 2007, the Company made contributions to the Plan on a quarterly basis 1% of each eligible participant's base salary, ***regardless of whether the eligible participant contributed to the Plan, which contribution was automatically invested in the Company Stock Fund***. *See* 2007 11-K at 6; SPD at 20. Moreover, under the ESOP, dividends paid on Company Stock in the Company Stock Fund were automatically reinvested back into the Company Stock Fund. *See* SPD at 27.

76.     On or about January 22, 2007, the Compensation Committee adopted resolutions which approved amendments to and restatements of the Plan. *See* 2007 Plan at 83. Further, the Compensation Committee authorized and directed the appropriate officers of the Company "to give all such notices, to execute and deliver all such documents, and to take such action [in connection with the amendment and restatement of the Plan] as such officers deem necessary or appropriate in order to make effective and to carry out the purpose and intent of the … resolutions." *Id.*

---

[13] A true and correct copy of the PSSA is annexed hereto as Exhibit I.

77.     In the SMM provided to Plan participants, the Company announced, *inter alia*, as of the effective date, that it would no longer make Company Stock Contributions to the Plan. *See* SMM at 5.   It also announced new limits on contributions by Plan participants to the Company Stock Fund:

> **Limitation on Investments in the American Express Company Stock Fund**
>
> As of the [sic] July 1, 2007, your contributions to the American Express Company Stock Fund (the "Fund") will be subject to new limits as follows:
>
> ●     You will not be permitted to make an investment election to contribute more than 10% of your future contributions to the Fund.
>
> ●     If more than 10% of your overall RSP balance is held in the Fund, you will not be permitted to transfer additional monies to the Fund.
>
> ●     If less that 10% of your overall RSP balance is held in the Fund, you will be permitted to transfer additional monies to the Fund, but only to the extent the balance in the Fund after the transfer does not exceed 10% of your overall RSP balance.
>
> While you are not required to sell or transfer monies from the Fund, some action may be required on your part when these new rules come into effect.   Specifically, if your current investment election allocates over 10% of your contributions to the Fund, you need to adjust your allocation.   If you do not make a change to limit your contributions to the Fund to 10% or less, then your election above the 10% limit **will be redistributed** among your other investment elections pro rata (subject to the RSP's normal administrative and operational restrictions).   If you have elected to direct 100% of contributions to the Fund and you do not change that election, any future contributions above the 10% limit will be directed to the Target Retirement Date Fund that corresponds closest to the year in which you will turn 65.

SMM at 6 (emphasis added).

78.     Indeed, effective July 1, 2007, future contributions of Plan participants to the Company Stock Fund were capped at 10% of the total value of their overall retirement plan account balances.  The Plan describes the 10% cap as follows:

> Notwithstanding anything herein to the contrary, no Participant, alternate payee or beneficiary may transfer amounts to the Company Stock Fund to the extent that such transfer would result in the aggregate Company Stock holdings of such Participant, alternate payee or beneficiary under the Plan exceeding ten percent (10%) of the total value of his or her Accounts (determined at the time of transfer).  Furthermore, no participant may direct that an amount in excess of ten percent (10%) or his or her ongoing contributions be allocated to the Company Stock Fund.

2007 & 2008 Plans § 6.3.  See SPD at 24.

79.     Further, the Administration Committee approved investment direction procedures for the Plan.  *See* American Express Retirement Savings Plan Investment Direction Procedures, dated July 1, 2007 ("IDP").[14]  The IDP provides, in relevant part, the following with respect to the limitation of investments in the Company Stock Fund:

> The Plan document specifically limits investments in the American Express Company Stock Fund (the "Fund").  The provisions below are intended to reflect the terms of the Plan.  It is expressly understood that EBAC does not have discretion with respect to the Fund, including, but not limited to, the limits set forth below.
>
> (a)     *Future Contributions*.  A Participant shall not make an investment election to contribute more than ten percent (10%) of his or her future contributions to the Fund.
>
> (b)     *Ten Percent Limit*.  A Participant shall not transfer additional monies into the Fund if more than ten percent (10%) of his or her total account balance under the Plan is held in the Fund. …
>
> (c)     *Default Rule*.  In accordance with the actions taken by the

---

[14] A true and correct copy of the IDP is annexed hereto as Exhibit J.

Incentive Savings Plan Investment Committee, if a Participant's current investment election allocates more than ten percent (10%) of his or her contributions to the Fund, the Participant shall adjust his or her election to allocate no more than ten percent (10%) of his or her total contributions to the Fund.  If a Participant does not limit his or her contributions to the Fund to ten percent (10%) or less of his total contributions to the Plan, the Participant's contributions to the Fund in excess of ten percent (10%) of his or her total contributions to the Plan will be redistributed among the Participant's other investment elections on a pro rata basis. Finally, if a Participant has elected to direct one hundred percent (100%) or his or her contributions to the Fund and the Participant does not change his or her election, all future contributions to the Fund in excess of ten percent (10%) shall be directed to the Target Date Retirement Fund that most closely corresponds to the year in which the Participant will reach age 65.

IDP § 2.

80.     Finally, the Company ceased making Company Stock Contributions to the Plan effective July 1, 2007.  *See* 2007 11-K at 6.

81.     Pursuant to the SPD, the Administration Committee and the Investment Committee were named fiduciaries to the Plan and one or the other, or both, possessed fiduciary authority and responsibility regarding the restriction on the amounts that Plan participants could contribute (on an ongoing and aggregate basis) to the Company Stock Fund:

> The RSP is administered by the Employee Benefits Administration Committee . . . and the Retirement Savings Plan Investment Committee . . ., consisting of employees of the Company. ***Generally***, the Committees are responsible for the resolution of all questions arising under the Plan.  The Administration Committee oversees Plan administration, including claims for benefits.  The Investment Committee oversees issues related to Plan investments (except for the American Express Company Stock Fund).  Members of the Committees are fiduciaries and serve without compensation.  The Committees have delegated various duties and powers to other Company employees and to certain third parties.

SPD at 59 (emphasis added).

82.     Pursuant to the Plan, the Administration Committee and the Investment Committee were named fiduciaries to the Plan and one or the other, or both, possessed fiduciary authority and responsibility regarding the limitation on the amounts that Plan participants could contribute (on an ongoing and aggregate basis) to the Company Stock Fund:

> Each of the Administration Committee and the Investment Committee is a "named fiduciary" under the Plan. . . .
>
> The Administration Committee shall discharge the duties and responsibilities and shall have the authority specified in the Plan or Trust Agreement.  The Investment Committee shall discharge the duties and responsibilities and shall have the authority specified in the Plan or Trust Agreement.

2007 & 2008 Plans § 10.1.

83.     Pursuant to the Plan, the Administration Committee is and was authorized and empowered to administer the Plan, to establish rules and regulations for Plan administration, including without limitation the investment of Plan assets, and to make determinations regarding, without limitation, eligibility to participate and for benefits:

> Without limiting the scope of such other duties, responsibilities and authority as may elsewhere in the Plan or Trust Agreement be specified as belonging to it, the Administration Committee shall have the power, the duty, and the complete and exclusive discretion to: administer the Plan and to establish such rules and regulations in connection therewith as it determines to be necessary or appropriate in the circumstances; conclusively make all determinations necessary for the administration of the Plan, including without limitation determinations as to eligibility to participate and eligibility for benefits; construe, interpret, and supplement the Plan whenever necessary to carry out its intent and purpose and to facilitate the Plan's administration; decide any claims arising out of or related to a denial of Plan benefits or the administration or operation of the Plan or the investment of Plan assets, including but not limited to claims for benefits, participation rights and breach of fiduciary duty under ERISA Section 502; and prepare, file with the appropriate governmental agency, furnish or make available to appropriate Participants, alternate payees, and beneficiaries, the various statements, reports, descriptions, registrations and other documents all as required by

ERISA, or cause such filings to be prepared and made.

2007 & 2008 Plans § 10.3(a).

84.     Pursuant to the Plan, the Administration Committee was expressly directed to follow participants' directions regarding allocation of retirement savings among Plan options only to the extent that such instructions complied with the terms of the Plan:

> A Participant in the Plan who directs the investment of a contribution to the Plan on the Participant's behalf or who directs the investment of the assets or his or her Account under the Plan to the Company Stock Fund shall be deemed to have provided a direction to transfer such amounts to the ESOP. A Participant, alternate payee or beneficiary in the ESOP who directs the investment of the assets of his or her Account under the ESOP to an investment other than the Company Stock Fund as permitted under the provisions of Article Six shall be deemed to have provided a direction to transfer such amounts to the Plan. The Administration Committee shall comply with a direction by a Participant, alternate payee or beneficiary to transfer funds from the Plan to the ESOP or vice versa consistent with the Plan and such general rules as may be established by the Administration Committee, Investment Committee or the Company for transfers among and between investment options.

2007 & 2008 Plans § 17.9.

85.     By necessary implication, Section 17.9 of the Plan named the Administration Committee, the Investment Committee, and the Company as fiduciaries of the Plan regarding the allocation or transfer of assets among retirement savings options and obligated, authorized, and empowered the Administration Committee, the Investment Committee, and the Company (or any one or more of them) to establish general rules for such allocation or transfer of assets.

86.     Pursuant to the Plan, among other duties, responsibilities, and authority, the Investment Committee is and was authorized and empowered to "prepare and submit periodic reports summarizing the assets, liabilities and investment performance of the Plan."   2007 & 2008 Plans § 10.4.  In that particular regard, the Investment Committee's duty, responsibility,

and authority was not limited just to the Discretionary Funds (other than the Company Stock Fund) as its other duties, responsibilities, and authority were limited, but rather applied to all assets of the Plan, including the Company Stock Fund.

87.     As of December 31, 2006, Plan assets allocated to the Company Stock Fund represented approximately 31% ($981,638,342) of the total assets in the Plan ($3,139,065,879). *See* 2006 11-K at 10 & 19.

88.     After the amendment to the Plan, which required that only 10% of a participant's assets, on both an ongoing and aggregate basis, could be allocated to the Company Stock Fund, became effective on July 1, 2007, substantially more than 10 percent of the assets of the Plan continued to be invested in the Company Stock.

89.     As of December 31, 2007, Plan assets allocated to the Company Stock Fund represented approximately 24% ($778,417,086) of the total assets in the Plan ($3,140,468,860). *See* 2007 11-K at 12 & 34.  The reduction from 31% to 24% of Plan assets invested in the Company Stock Fund in 2007 occurred in whole or in part because of the decline in the price of Company Stock over that period of time, as the number of shares of Company Stock held in the Company Stock Fund as of December 31, 2006, and December 31, 2007, were 16,085,913 and 14,785,267, respectively.

90.     As of December 31, 2008, Plan assets allocated to the Company Stock Fund represented approximately 12% ($251,895,026) of the total assets in the Plan ($2,114,719,077). *See* 2007 11-K at 14 & 29.  The reduction from 24% to 12% of Plan assets invested in the Company Stock Fund in 2008 again occurred in whole or in part as a result of the sharp decline in the price of Company Stock over that period of time, as the number shares of Company Stock

held in the Company Stock Fund as of December 31, 2007 and December 31, 2008, were 14,785,267 and 13,494,410, respectively.

91.     After a reasonable opportunity for further investigation and discovery, the evidence will show that:

   a.     Defendants did not, at any time, take any action to adopt rules or regulations to implement or assure compliance with the July 1, 2007, Plan amendment limiting the percentage of a participant's ongoing or aggregate contribution to the Company Stock Fund;

   b.     Defendants did not, at any time, take any action to implement or assure compliance with the July 1, 2007, Plan amendment limiting the percentage of a participant's ongoing or aggregate contribution to the Company Stock Fund;

   c.     Defendants did not, at any time, take any action to comply with the July 1, 2007, Plan amendment limiting the percentage of a participant's ongoing or aggregate contribution to the Company Stock Fund; and

   d.     Defendants did not, at any time, restrict any Plan participant's contributions to the Company Stock Fund in accordance with the July 1, 2007, Plan amendment.

92.     Throughout the Class Period, the Investment Committee and its appointed fiduciaries were authorized and required to evaluate the performance of *all* retirement savings options under the Plan, including the Company Stock Fund, to determine the continuing appropriateness of each retirement asset, in order to permit them to comply with their fiduciary duties under ERISA §§ 404(a)(1) and (a)(2), 29 U.S.C. §§ 1004(a)(1) and (a)(2).

93.     The Investment Committee was expressly empowered and authorized to invest, acquire, manage or dispose of Plan assets, including Company Stock.  *See* Trust Agreement § 4.2(a).  At least before January 1, 2008, the Investment Committee's authority to manage or dispose of shares of Company Stock was not limited in any way other than the 10% cap alleged above.

94.     According to Appendix 1 to the SIO, the Investment Committee was, by

necessary implication, authorized to monitor the performance of the Company Stock Fund:

> Absent extraordinary circumstances, the [Investment] Committee will not monitor the performance of the Company Stock for the purpose of recommending levels of Company Stock investment in the Plan or for the elimination of Company Stock as a Plan investment.

SIO at 9.

95.     Upon information and belief, the Plan did not prohibit or limit the ability of Plan fiduciaries to remove any retirement savings option or divest assets invested in any fund as prudence dictates, and the duties of prudence and loyalty imposed by ERISA do not permit Plan fiduciaries to offer, acquire, or hold imprudent retirement assets.

96.     Plan participants are 100% vested in their own contributions and Company matching contributions.  *See* 2007 & 2008 Plans § 7.1(b) & (d) ("All amounts allocated to the Accounts of Participant that are attributable to Elective Contributions, Voluntary Contributions, Company Stock Contributions, Qualified Nonelective Contributions, Rollover Contributions and SOP Transfer Accounts shall be one hundred percent (100%) vested") and ("All amounts allocated to the Accounts of Participants that are attributable to Company Matching Contributions made with respect to Elective Contributions for pay periods ending prior to July 1, 2007 shall be one hundred percent (100%) vested").

97.     The SPD acknowledges that the SEC requires the Company to incorporate by reference its filing made with the SEC.  The SPD sets forth, in relevant part, the following:

> The SEC requires the Company to "incorporate by reference" into the 2007 Prospectus the filings we make with the SEC. Incorporated documents are part of the 2007 Prospectus even though they are not attached.  Information we later file with the SEC will automatically update and supersede the information contained in this document.

SPD at 63.

98.    The SPD lists the following documents as incorporated by reference, as well as any future filing to be made with the SEC pursuant to sections 13(a), 13(c), 14 and 15 (d) of the Securities Exchange Act of 1934 (the "Exchange Act"):

a.    Annual Report on Form 10-K for fiscal year ended December 31, 2006;

b.    Quarterly Report on Form 10-Q for fiscal quarter ended March 31, 2007;

c.    Current Report on Form 8-K dated January 3, 2007, current Report on Form 8-K dated February 13, 2007, current Report on Form 8-K dated February 23, 2007, current Report on Form 8-K dated April 23, 2007, current Report on Form 8-K dated May 24, 2007, current Report on Form 8-K dated May 29, 2007, current Report on Form 8-K dated June 14, 2007, current Report on Form 8-K/A dated December 1, 2006, current Report on Form 8-K/A dated January 22, 2007, current Report on Form 8-K dated June 20, 2007, current Report on Form 8-K dated July 10, 2007 and current Report on Form 8-K dated July 17, 2007;

d.    The description of the Company Stock appearing in the Registration Statement on Form 8-A Amendment No. 1, dated June 12, 2003;

e.    The Plan's Annual Report on form 11-K for the Plan Year ended December 31, 2006;

f.    Annual Report on Form 10-K for fiscal year ended December 31, 2007; and

g.    Current Report on Form 8-K dated February 29, 2008.

*Id*. at 63 & 74.

## V.    DEFENDANTS' FIDUCIARY STATUS

### A.    The Nature of Fiduciary Status

99.    **Named Fiduciaries**.  ERISA requires every plan to have one or more "named fiduciaries."   ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).   The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.   ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

100.    *De Facto* **Fiduciaries**.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary

functions.  *See* ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).  Thus, a person is a fiduciary

to the extent "(i) he exercises any discretionary authority or discretionary control respecting

management of such plan or exercises any authority or control respecting management or

disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct

or indirect, with respect to any moneys or other property of such plan, or has any authority or

responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility

in the administration of such plan."  *Id*.

101.    Each Defendant was a fiduciary with respect to the Plan and owed fiduciary

duties to the Plan and the participants in the manner and to the extent set forth in the Plan's

documents, under ERISA, and through their conduct.

102.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C.

§ 1104(a)(1), to manage and administer the Plan and the Plan's assets solely in the interest of the

Plan participants and beneficiaries and with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims.

103.    Plaintiffs do not allege that each defendant was a fiduciary with respect to all

aspects of the Plan's management and administration.  Rather, as set forth below, Defendants

were fiduciaries to the extent of the fiduciary discretion and authority assigned to or exercised by

each of them, and the claims against each defendant are based on such specific discretion and

authority.

104.    Instead of delegating all fiduciary responsibility for the Plan to external service

providers, American Express chose to assign the appointment and removal of fiduciaries to itself

and the other Defendants named herein.  These persons and entities in turn selected Company employees, officers and agents to perform most fiduciary functions.

105.    ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions.  ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3).  However, insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

### B.    The Company's Fiduciary Status

106.    As the Plan Sponsor, American Express is a named fiduciary of the Plan pursuant to ERISA § 402(a)(l), 29 U.S.C. § 1002(2l)(A).  As the Plan Sponsor, the Company had the responsibility of establishing retirement savings options or alternatives in the Plan and served the right to change any retirement savings alternatives, including the right to eliminate retirement funds.  Thus, this responsibility also included the duty of monitoring the performance of the retirement funds in the Plan, including the Company Stock Fund.  These are fiduciary functions under ERISA, pursuant to Department of Labor regulations.  29 C.F.R. § 2509.75-8 (D-4).

107.    American Express, at all applicable times, exercised control over the activities of its officers and employees, including control over their activities related to the Plan.  Through the Board or otherwise, the Company had the authority and discretion to appoint, monitor and remove members of the Compensation Committee as well as officers and employees serving on the Administration and Investment Committees.  Accordingly, the actions of the Administration Committee Defendants, Investment Committee Defendants and Defendant Dwyer are imputed to American Express under principles of agency and the doctrine of *respondeat superior,* and the Company is liable for such actions.

108.   American Express also had the fiduciary duty to appoint and, hence, a duty to monitor and remove the Trustee, and to execute the Trust documents with the Trustee to provide for the investment, management, and control of the Plan's assets.

109.   The Company also acted as a fiduciary in connection with the dissemination of Plan communications made to the Plan's participants.  It made direct representations to the Plan's participants relating specifically to the Plan's retirement savings options, the Company's business and financial condition, and the merits of investing the Plan's assets in the Company Stock, and those representations were intended to communicate information to participants necessary for them to manage their savings accounts under the Plan.

110.   American Express was responsible for disseminating summary plan descriptions ("SPDs") for the Plan to participants.  It was also responsible for disseminating to participants the Plan's Prospectus, which purported to describe the investment characteristics of the Plan's various retirement savings options.   The Prospectus and all information contained or incorporated therein constitute representations disseminated in a fiduciary capacity upon which participants were entitled to rely in making decisions concerning their benefits and the investment and management of the Plan's assets allocated to their accounts.

111.   Upon information and belief, the Company's filings with the SEC, including, but not limited to, annual reports, press releases, Forms 10-K, Forms 10-Q, and Registration Statements, were part of the SPD and the Prospectus.  American Express exercised discretion over the contents of the SPDs and the Prospectuses it disseminated, which were intended to communicate information to Plan participants necessary for participants to manage their savings accounts under the Plan.

112.    Under ERISA, the Company was not required to cause the Plan to offer the Company Stock as a retirement savings option under the Plan or to incorporate all of its SEC filings into the Plan's documents, but, once it elected to do so, it rendered the disclosures contained in the SEC filings disclosures made in a fiduciary capacity.

C.    **Director Defendants' Fiduciary Status**

113.    According to the Company's Definitive Proxy Statement filed with the SEC on March 15, 2008, its business is conducted "under the direction and oversight of the Board of Directors."

114.    Throughout the Class Period, the Director Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21),29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

115.    In addition, the Director Defendants were fiduciaries of the Plan because they issued Plan communications to Plan participants by signing SEC filings that are specifically incorporated into Plan documents.  Indeed, all of the Director Defendants signed the Form 10-K filed with the SEC on February 28, 2008 on behalf of American Express in their capacities as directors.  Defendant Chenault also signed certifications to the Forms 10-Q filed by the Company throughout the Class Period, certifying that the information contained in each Form 10-Q fairly presented, in all material respects, its financial condition and results of operations.

D.    **Compensation Committee Defendants' Fiduciary Status**

116.    In addition to their fiduciary status as members of the Board, as described above, Defendants Leschly, McGinn, Miller, Walter, and Chernin were fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority

or discretionary control respecting the management of the Plan, the administration of the Plan, and/or the management or disposition of the Plan's assets.

117.   The Compensation Committee Members were responsible for appointing members of the Benefits Committee, a fiduciary of the Plan, to manage the operation and administration of the Plan.

### E.   Administration Committee Defendants' Fiduciary Status

118.   As a designated Administrator of the Plan, the Administrative Committee was a named fiduciary of the Plan under ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).   Defendant Christensen and the other members of the Administration Committee exercised discretionary authority or discretionary control respecting the management of the Plan, the administration of the Plan, the management or disposition of the Plan's assets, and/or communication with Plan participants.

### F.   Investment Committee Defendants' Fiduciary Status

119.   As a designated Administrator of the Plan, the Investment Committee was a named fiduciary of the Plan under ERISA § 3(16)(A), 29 U.S.C. § l002(16)(A).   The Investment Committee exercised discretionary authority and responsibility for selecting, evaluating, monitoring and altering the makeup of the retirement savings alternatives provided under the Plan.

120.   The Investment Committee exercised discretionary authority or control in selecting, evaluating, monitoring, and altering the makeup of the retirement savings alternatives available under the Plan.   The Investment Committee also had the discretionary authority or control to appoint investment managers to make investment decisions for the Plan.

121.   Upon information and belief, the Investment Committee Defendants also had the responsibility to provide complete and accurate information to participants about the retirement

savings offerings in the Plan, either directly or by communicating that information to the Board.

### G.    Defendant Dwyer's Fiduciary Status

122.    In addition to his service on the Investment Committee, Defendant Dwyer is a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § l002(2l)(A), in that Defendant Dwyer signed the Form 5500 as the individual signing as the Plan Sponsor.

## VI.    FACTUAL BACKGROUND TO BREACHES OF FIDUCARY DUTY

### A.    The Company's Misrepresentations and Omissions

123.    Throughout the Class Period, American Express repeatedly misled the Plan's participants and beneficiaries regarding the effect that a weakening economy and declines in consumer credit card spending had and would continue to have on the Company's financial business.  The Company represented that, while nationwide declines in credit spending would negatively impact its key competitors, its credit business and growth potential remained strong, and it would still meet its 2008 full year guidance.

124.    However, throughout the Class Period, the Company was susceptible to huge financial losses because it was heavily dependent upon revenue from consumer credit card spending during a time when the economy was weakening and nationwide consumer credit card spending was sharply declining.  During this time, the Plan's fiduciaries knew or should have known that the above made the Plan's continued holding of Company Stock imprudent.

125.    On April 19, 2007, the Company Stock opened at a trading price of $58.50 per share.

126.    On April 19, 2007, American Express issued a press release entitled "*American Express Reports Record Net Income.  Earnings Per Share From Continuing Operations Rise 26%.  Nearly 2 Million Cards-In-Force Added in the First Quarter.*"   In reporting a 22%

increase in income and a 10% increase in consolidated revenues for the first quarter 2007, the

Company announced:

> Higher revenues, combined with tight controls on discretionary expenses, delivered excellent bottom line results for the quarter.
>
> * * *
>
> ***Our strong revenue growth*** reflects the benefit of multi-year investments in our payments business that are generating ***across-the-board spending growth from consumer, small business and corporate Cardmembers***.
>
> Our ability to customize marketing and reward programs for areas with the highest returns helped us to start the year with strong momentum.
>
>
> ***Our performance was again at the top of the industry, with Cardmember spending up 15 percent*** and loan volumes up 29 percent. We also added nearly 2 million cards-in-force this quarter.
>
> ***Credit quality was very strong***, reflecting our management controls and continued success in the premium sector.

(Emphasis added).

127.    With respect to its U.S. Card Services Segment, the Company reported first

quarter net income of $644 million, up 22% from $527 million a year ago. It further reported a

16% increase in revenues net of interest expense and a 57% increase in Cardmember lending

finance revenue, stating that these increases reflected "higher spending and borrowing by

consumers and small business" and "substantial growth in owned loan volume," respectively.

128.    On July 23, 2007, the Company issued a press release entitled "*American Express

Reports Strong Results on Record Cardmember Spending. More than 2 Million Cards-in-Force

Added in the Quarter*." It reported second quarter income from continuing operations of $1.1

billion, up 9% from $972 million a year ago, net income of $1.1 billion, up 12% from $945

million a year ago, and consolidated revenues net of interest expense of $7.1 billion, up 9% from $6.5 billion a year ago.  It further announced:

> *Continued growth in Cardmember spending and excellent credit quality generated strong earnings for the quarter*.
>
> Spending on American Express cards rose 15 percent and we added more than 2 million cards during the last three months.
>
> As expected, interest costs increased and provisions rebounded from the exceptionally low levels of last year.  We dealt with this short-term challenge by controlling discretionary expenses and carefully targeting our marketing investments.
>
> *The result was strong performance in the second quarter and excellent momentum as we head into the latter half of 2007*.
>
> Given that momentum, *we will be looking to capitalize on opportunities to further strengthen our lead in the payments industry at a time when some key competitors may be cutting back or dealing with weakness in parts of their business*.

(Emphasis added).

129.    On October 22, 2007, the Company issued a press release entitled "*American Express Reports Strong Results on Higher Revenues and Record Cardmember Spending.  2.5 Million Cards-In-Force Added in the Quarter*."   In reporting third quarter net income from continuing operations of $1.1 billion, up 15% from $934 million a year ago, and an 11% increase in consolidated revenues for the third quarter 2007, it announced:

> *Our strong earnings growth this quarter* reflected a 16 percent rise in combined spending by consumers, small businesses and corporate Cardmembers.
>
> Investments that expanded our service, rewards and loyalty programs helped to add 2.5 million cards during the quarter while also generating excellent spending increases from existing Cardmembers.
>
> *While we continue to be cautious about the overall economy, our ongoing focus on the premium sector and careful management of loan and investment portfolios allowed us to maintain strong credit quality that compares favorably to the industry*.

> *We continued to build on the momentum of recent periods,*
> *generating excellent revenue growth and ending the quarter in a*
> *strong competitive position.*

(Emphasis added).

130.    With respect to its U.S. Card Services Segment, the Company reported third quarter net income of $592 million, up 6% from $558 million a year ago.  It also reported a 12% increase in revenues net of interest expense for the third quarter, "reflecting higher spending and borrowing by consumers and small businesses."

131.    On January 28, 2008, the Company issued a press release entitled "*American Express Full-Year EPS From Continuing Operations Rises 16% Fourth-Quarter Earnings in Line with Pre-Announcement*," reporting an increase in net income for the full year of $4.0 billion, up 8% from the previous year.  It also reported a 10% rise in consolidated revenues net of interest expense from $6.7 billion a year ago to $7.4 billion.

132.    With respect to its U.S. Card Services Segment, the Company reported an 11% increase in revenues net of interest expense for the fourth quarter, "reflecting higher spending and borrowing by consumers and small businesses."

133.    Further, it claimed that, despite seeing "clear signs of a weakening economy and business environment in December," *"[r]esults for the year met or exceeded all of our long-term financial targets*…Strong Cardmember spending and the nearly 8.5 million new cards we added in 2007 represented a continuing return on multi-year business-building investments." (Emphasis added).

134.    Again downplaying the affect of declines in credit spending on its business, the Company stated:

> *Despite the December weakness that we discussed a few weeks*
> *ago, fourth-quarter business volumes and credit indicators*
> *continued to be in the top tier of the industry*.  Marketing and

related investments remained focused on premium segments of the
market.

(Emphasis added).

135.    Despite acknowledging "deterioration in the economic and credit environment,"
the Company pledged that, "*we believe our focus on the premium sector should help us to
weather the current conditions better than many competitors*." (Emphasis added).

136.    It further assured, assured that "[w]e also remain confident in our ability, on
average and over time, to meet our long-standing financial targets of 12 to 15 percent EPS
growth, at least 8 percent revenue growth and a return on equity of 33 or 36 percent."

137.    By the close of trading on January 28, 2008, the Company Stock closed at $47.40
per share.

138.    On April 24, 2008, the Company issued a press release entitled "*American
Express Revenues Rise on Higher Cardmember Spending Credit Indicators in Line with
Expectations*," reporting an 11% increase in consolidated revenues net of interest expense from a
year ago.  It further declared:

> *We delivered stronger than expected revenue growth this quarter,
> despite a weak and uncertain U.S. economy* …. Business volume
> growth was in the top tier of the industry, as we realized
> continuing returns on our multi-year investments and benefited
> from a diverse consumer and business-to-business portfolio.
> Cardmember spending rose 14 percent, driven by strength in the
> international markets, among bank partners and in the corporate
> sector.
>
> *We continued to invest in longer-term opportunities at a time
> when some traditional competitors have been constrained by
> problems elsewhere in their operations.*  Marketing and related
> spending was up 20 percent, with a focus on affluent U.S.
> consumer and the international markets.

(Emphasis added).

139.    Despite a deteriorating economy, the Company reassured that, "[w]hile we continue to be cautious about the U.S. economy, we are encouraged by our performance internationally.  And, based on the breadth and flexibility of our business model, ***we remain on track for the 4-6 percent EPS growth that we indicated at the start of the year***, barring significant deterioration in the economic environment."  (Emphasis added).

140.    With respect to its U.S. Card Services Segment, the Company reported an 11% increase in revenues net of interest expense for the first quarter of 2008, "reflecting higher spending and borrowing by consumers and small businesses."

141.    By the close of trading on April 24, 2008, the Company Stock closed at $45.18 per share.

B.    **The Company's May 2, 2008 Admissions**

142.    On May 2, 2008, the Company filed a Form 10-Q with the SEC for the quarter ended March 31, 2008.  In the section labeled "Outlook," the Company acknowledged for the first time that, notwithstanding its previous expressions of anticipated continued growth and being "on track," its financial growth and EPS guidance for 2008 would be negatively affected by the weakening economy.  Specifically, it stated:

> Early in the year, the Company announced its expectations for slower growth in cardmember spending and weaker credit trends in the year ahead, and that these factors would lead to slower growth in earnings per share in 2008 than the Company has generated in recent years.  The Company's planning assumptions were based on a moderate downturn in the U.S. economy and a more cautious view of the business environment in the coming year.
>
> As expected, in the first quarter of 2008, the U.S. cardmember lending write-off rate rose compared to the fourth quarter of 2007.  This write-off rate was higher than the average for the quarter, and therefore the Company expects that these loan loss rates will be higher in the second quarter of 2008 than in the first quarter.  In addition, ***the Company also believes that the combined impact of the Company's credit-related actions in the United States, such***

41

>*targeted line reductions, slower cardmember spending and the*
>*current environmental conditions will likely cause loan growth in*
>*the United States to be slower than the growth assumed in the*
>*Company's initial plan.*

(Emphasis added).

143. Prior to May 2, 2008, American Express had not adequately disclosed the extent to which the weakening economy and declines in consumer credit spending would adversely affect its financial business and EPS growth.  Notably, all of the other Form 10-Q's filed by American Express with the SEC during the Class Period, as well as the Form 10-K filed with the SEC on February 28, 2008, omitted any expectations by the Company that it would not be able to meet its EPS guidance for 2008.[15]  In fact, its April 24, 2008 press release issued just prior to the May 2 Form 10-Q reassured that, although it is "cautious about the U.S. economy, *we remain on track for the 4-6 percent EPS growth that we indicated at the start of the year*." (Emphasis added).

144. On July 21, 2008, the Company issued a press release entitled "*American Express Reports Second Quarter Earnings; Revenues Rise on Higher Cardmember Spending; Earnings Decline as Company Adds to Lending Credit Reserves*," announcing that second quarter income from continuing operations dropped 37%, down to $655 million, from $1.0 billion a year ago, and net income also plummeted 38%, down to $653 million for the quarter.

145. The Company acknowledged that the second quarter results "included a $600 million ($374 million after-tax) addition to U.S. lending credit reserves that reflects a deterioration of credit indicators beyond our prior expectation, and a $136 million (485 million

---

[15]      Prior to April 2, 2008, the Company also filed Form 10-Qs with the SEC during the Class Period on May 9, 2007, August 7, 2007, and November 9, 2007.

after-tax) charge to the fair market value of the Company's retained interest in securitized Cardmember loans."

146.    It further explained its business decline by stating that:

> Fallout from a weaker U.S. economy accelerated during June with consumer confidence dropping, unemployment rates moving sharply higher and home prices declining at the fastest rate in decades…Consumer spending slowed during the latter part of the quarter and credit indicators deteriorated beyond our expectations.
>
> ***In light of the weakening economy, we are no longer tracking to our prior forecast of 4-6 percent earnings per share growth***.  That outlook was based on business and economic conditions in line with, or moderately worse than, January 2008.  The environment has weakened significantly since then, particularly during the month of June.

(Emphasis added).

147.    In the press release, Defendant Chenault acknowledged that "[t]he scope of the economic fallout was evident even among our longer term, superprime Cardmembers…  Newer Cardmembers – whose write-off levels are typically higher than the total portfolio – are also feeling the impact."

148.    With respect to its U.S. Card Services Segment, the Company revealed that its provisions for losses "increased significantly" to $1.5 billion, up from $640 million a year ago.

149.    On July 31, 2008, the Company filed its Form 10-Q with the SEC for the quarter ended June 30, 2008, making similar disclosures regarding the impact that national declines in cardmember spending would have on its credit business.  Specifically, it announced:

> Early in the year, the Company announced its expectations for slower growth in cardmember spending and weaker credit trends in 2008, and that these factors would lead to slower growth in earnings per share in 2008 than the Company has generated in recent years.

* * *

> Given the credit deterioration and the continued moderation in volume growth the Company experienced in the U.S. during June, as well as the Company's outlook for continued weakness in the U.S. economy, ***the Company is no longer tracking to its prior forecast of 4-6 percent EPS growth in 2008***.  In addition, the Company expects U.S. Cardmember lending write-off rates in the third and fourth quarters will be higher than the June level.

(Emphasis added).

150.   However, as stated above, prior to May 2, 2008, the Company failed to disclose any expectations that its growth in earnings per share in 2008 would be slowed.  Quite the contrary, it continuously downplayed the affect that the weakening economy would have on its growth potential.

151.   On October 20, 2008, the Company issued a press release entitled "*American Express Third Quarter Revenues Rise Earnings Decline on Increased Credit Provisions*," reporting additional third quarter declines from a year ago in net income (down 24%), and income from continuing operations (down 23%).  It revealed that:

> While we continued to generate a substantial level of earnings this quarter, bottom line results were down from a year ago as growth in Cardmember spending slowed, lending volumes moderated, and we set aside significant additions to our loan loss reserves.
>
> ***We saw clear signs earlier this year of a weakening environment and the recent volatility in the financial markets has reinforced our view that consumer and business sentiment is likely to deteriorate further, translating into weaker economies around the globe well into 2009.***  Cardmember spending is likely to remain soft.  Loan growth will be restrained, in part because of the steps we are taking to reduce credit risks, and credit indicators are likely to reflect the continued downturn in the economy and throughout the housing sector.

(Emphasis added).

152.   With respect to its U.S. Card Services Segment, the Company stated that its provisions for losses increased to $941 million, up from $638 million a year ago, "reflecting

increased write-off and past due rates driven by the impact of the economic slowdown."

153.    By the close of trading on October 20, 2008, the Company Stock was down to $24.35 per share.

154.    Further indicative of how severely its credit card practices have damaged its financial well-being, on October 20, 2008, American Express announced that it plans to cut 7,000 jobs, or about 10% of its worldwide work force, in an effort to slash costs by $1.8 billion in 2009.   An October 30, 2008 USA Today news article entitled "*American Express will cut 7,000 jobs*" reported that the announcement was a "stark acknowledgement of the tough times ahead" for the Company.

155.    The Company's financial collapse is additionally evidenced by its November 10, 2008 approval to become a licensed bank-holding company.  American Express sought "bank-holding" status in order to obtain low-cut financing from the Federal Reserve necessary to strengthen its weakened position.  As a November 11, 2008 Herald Tribune news article entitled "*American Express becomes bank holding company*," reported that, "when [the Company's] financing costs soared as the commercial paper markets froze, the company increasingly recognized that it needed to diversify its sources of financing."

156.    Although the application process for becoming a licensed bank-holding company can take 45 days or longer, the Company's application was approved in half of that time due to the dire circumstances faced by its business.  As reported in a November 10, 2008 news article by The New York Times entitled "*American Express to become Bank Holding Company*," the Federal Reserve granted the Company's request to obtain bank-holding status so quickly, claiming that "emergency conditions exist that justify expeditious action on this proposal."

157.    Moreover, a December 19, 2008 MarketWatch news article entitled "*S&P Cuts

*American Express long-term ratings,*" reported that Standard & Poor's had lowered its long-term ratings on American Express, declaring that "[t]he outlook is negative. The actions reflect our concerns about the weakening operating environment for consumer lenders, deterioration in AmEx's credit-card loan portfolio and AmEx's wholesale funding."

158.    At the close of trading on December 19, 2008, the Company Stock had fallen to a price of $19.43 per share.

159.    Obtaining "bank-holding" status was thus necessary for the Company because such status provided it with greater access to the U.S. Treasury's bailout plan for banks. In fact, as reported in a December 24, 2008 Wall Street Journal news article entitled "*Treasury Will Invest Billions in AmEx, CIT,*" the Company will receive $3.39 billion in aid from the U.S. Treasury from its $700 billion bank bailout fund.

160.    The January 23, 2009 Associated Press news article entitled "*Earnings preview Credit costs in focus in AmEx 4Q*" noted that the Company's transformation into a bank holding company was a "surprise move that signaled to investors just how sever the credit card giant's troubles have become."

161.    A January 23, 2009 Associated Press news article entitled "Earnings preview Credit costs in focus in AmEx 4Q" reported that "[w]ith more consumers having trouble paying their bills, AmEx has seen the value of its primary assets decline. Funding its daily operations has also become more difficult and more costly amid the credit crisis."

162.    On January 26, 2009, the Company released its financial results for the fourth quarter and full year ended December 31, 2008, as well as its 2008 fourth quarter/full year earnings supplement. Substantiating the damaging effect that steep declines in consumer credit spending has had on its financial business, it reported the following quarterly financial losses:

- Quarterly profit plummeted nearly 80%, down from a profit of $831 million, or 71 cents a share, for the fourth quarter 2007 to $172 million, or 15 cents a share, for the fourth quarter 2008.  This marked the fifth-straight quarter of profit declines at American Express.

- Net income decreased 79% from $831 million for the fourth quarter 2007 to $172 million for fourth quarter 2008.

- Income from continuing operations declined 72% from $858 million for the fourth quarter 2007 to $238 million for the fourth quarter 2008.

- Diluted earnings per share from continuing operations were $0.21 for the fourth quarter 2008, down 71% from $0.73 for the fourth quarter 2007.

- Consolidated total revenues net of interest expense declined to $6.5 billion for the fourth quarter 2008, down 11% from $7.3 billion for the fourth quarter 2007.

163.    The Company further disclosed that its annual net income dropped 34% from over $4 billion for the year ended December 31, 2007 to approximately $2.6 billion for the year December 31, 2008.  Diluted earnings per share also dropped 30% for the year, down from $3.45 in 2007 to $2.42 in 2008.  Moreover, it substantially increased its provisions for losses from $4.1 billion in 2007 to $5.8 billion in 2008, an increase of 41%.  The Company's U.S. Card Services business segment, in particular, required an increase in provisions for losses from $3.0 billion in 2007 to $4.4 billion in 2008, an increase of 46%.

164.    Further emphasizing the Company's devastating 2008 fourth quarter and yearly financial results in a conference call held with investors on January 26, 2009, Defendant Chenault conceded that "[c]learly we are disappointed with our overall results."

165.    On January 26, 2009, the Company Stock had dwindled to a closing price of $15.20 per share – its lowest trading price in more than 12 years.

166.    In a letter addressed to the Company's investors contained in its 2008 Annual Report, Defendant Chenault summed up the abysmal year American Express had financially in

2008, admitting that it had been a "painful year" for its investors and that, "I know our shareholders cannot be pleased with the performance of our stock this year" and shares of the Company Stock "were hit hard and trailed the major market indices by a wide margin."

167.    Throughout the Class Period, shares of the Company Stock have consistently declined, falling to $12.87 per share on February 19, 2009; its lowest closing price since 1996.

168.    Continuing its downward spiral in value, The Company Stock fell to $9.71 per share on March 6, 2009.  A March 6, 2009 Reuters news article entitled "*AmEx shares fall below $10, lowest level since '95*" cited "concerns of higher-than-expected credit losses as the economy deteriorates."   In connection with the Company's systematic stock drop, the Reuters article explained that its U.S. net charge-offs – a measure of bad loan write-offs – increased to 6.5% in the fourth quarter from 3.7% a year ago, an increase of 76%.

169.    Indeed, on March 16, 2009, the Company filed a Regulation FD Disclosure with the SEC, reporting that its credit card defaults and delinquencies rose in the fourth quarter 2008 and that "it expects [its U.S. Card Services] past-due loans and write-offs to rise in the first and second quarters of 2009 from 2008 levels."

170.    A March 19, 2009, *Financial Times* news article entitled "*AmEx faces debt ratings cut*" likewise identified "concerns that growing numbers of [American Express borrowers] will default on their credit card debt."   According to rating agency Standard & Poor's, American Express has already "seen its asset quality deteriorate at a pace that exceeds median levels for the industry."   Consequently, Standard & Poor's advised that "it could cut the Company's single A debt rating to reflect the credit card issuer's recent disclosure of "escalating credit quality deterioration" amid expectations of continued economic weakness and pressures on the consumer."

171.    The asset quality deterioration at the Company noted in the March 19, 2009 *Financial Times* article was also the subject of discussion in a *Barron's* article on April 13, 2009. The *Barron's* article noted that "AmEx currently is paying the price for its promiscuous extension of credit and bad underwriting practices of recent years."   Among the poor underwriting practices at American Express discussed by *Barron's* was "an ill-fated company decision to push credit cards on folks with multiple mortgages (this had long been deemed a positive factor in creditworthiness) resulting in AmEx dramatically increasing its exposure to customers in the epicenter of the home-price collapse in California and Florida."

172.    Thus, the Company's problems were not merely due to general economic or financial market conditions, but rather were due as well to American Express' own poor underwriting standards.

173.    In downgrading the Company Stock, a multitude of others analysts have likewise observed that the Company's credit business is in the midst of utter collapse as consumer credit spending continues to decline and have warned that its business outlook for the next few years is extremely grim.

174.    Notably, on March 11, 2009, a MarketWatch news article entitled "*Goldman ups Morgan Stanley to buy, cuts American Express*" reported that, in downgrading the Company to "sell" from "neutral," Goldman Sachs stated that "consumer credit seems to be deteriorating by the day."   In fact, Goldman Sachs recommended that investors "short-sell" shares of American Express, demonstrating its belief that the Company Stock will continue to lose value.  A March 11, 2009 Reuters news article entitled "*Goldman recommends buy on Morgan Stanley, sell on AmEx*" cited "continued earnings challenges" as a cause for Goldman Sachs' downgrade of the Company from "neutral" to "sell."

175.    Also on March 11, 2009, Citigroup analyst Donald Fandetti cut his earnings estimate and price target for the Company Stock, citing "lower earnings power and deteriorating fundamentals" for cutting the Company's earnings and price target.  Fandetti further explained that "[d]ata from January showed rapid deterioration in credit quality at American Express, as the lender faces rising delinquencies and defaults among its borrowers."

176.    In a research note Fandetti published on March 11 said that "upcoming data about American Express' credit quality and first-quarter results are likely to put pressure on the company's share price" and "[c]ontinued deterioration could forces American Express to ramp-up loan-loss reserves in 2009."

177.    In addition, Stifel, Nicolaus & Co. analyst Chris Brendler recently chopped his fourth-quarter estimate on the Company to a loss of 41 cents per share from a profit of 15 cents. Based on expectations that spending volume as well as fee-based revenue will fall significantly.

178.    In a March 12, 2009 Reuters news article entitled "*AmEx may cut div but capital raise unlikely*: *Citigroup*," Fandetti stated that he "expects the company's first quarter earnings and upcoming master-trust date – the most frequent data point for gauging credit trends – to be 'negative catalysts' for the stock."   In fact, Fandetti has further cut his earnings estimates for American Express for 2009 through 2011, lowering his 2009 earnings estimate to 68 cents per share from $1.25 per share and his 2010 estimate to $1.15 per share from $2.00 per share.

179.    As the economy continues to deteriorate, the Company's write-off rate – debts it believes it will never be able to collect – continues to soar, increasing to 8.7% for the month February 2009, up from 8.3% for the month of January and from 7.5% for the month of December 2008.  A March 16, 2009 Reuters news article entitled "*U.S. credit card defaults rise to 20 year-high*" pointed out that "[a]nalysts estimate credit card chargeoffs could climb to

between 9 and 10 percent this year from 6 to 7 percent at the end of 2008.  In that scenario, such losses could total $70 billion to $75 billion in 2009." With respect to such charge-offs, Walter Todd, a portfolio manager at Greenwood Capital Associated, explained that, "[p]eople underestimated the severity of the downturn we are experiencing and I wouldn't be surprised to see [the Company] north of 10 percent," as it was most exposed to higher credit card losses, given its sole reliance on the industry.

180.   As recently as March 25, 2009, JP Morgan downgraded the Company from "Overweight" to "Underweight," thereby recommending to investors that they decrease their investment in Company Stock.

181.    In 2008, the Company Stock lost over 77% in value, dropping approximately 48% in stock price in the fourth quarter alone.

182.   With declines in consumer credit card spending and increases in credit delinquencies and loan losses expected in the upcoming years, the Company's heavy dependence on credit card spending will continue to damage its financial well-being.

183.   In a January 26, 2009 MarketWatch news article entitled "*American Express quarterly net income falls 79%*," Defendant Chenault was quoted as stating, "[w]e remain cautious about the economic outlook through 2009, and expect cardmember spending to remain soft with past-due loans and write-offs rising from current levels."

184.   In a January 26, 2009 article on TheStreet.com entitled "*AmEx Profit Off 80%; It Misses by a Cent*," Defendant Chenault was also quoted as stating that "[t]hese trends, together with the restructuring charge, had a significant impact on our bottom line…We remain cautious about the economic outlook through 2009, and expect cardmember spending to remain soft with past-due loans and write-offs rising from current levels."

185.     A January 26, 2009 Associated Press news article entitled "*American Express earnings fall 79 percent*" reported that American Express "said it expects [card] spending to continue to slow in 2009, and forecast for higher delinquencies and loan losses as consumers and businesses battle worsening economic trends."

186.     A January 23, 2009 Associated Press news article entitled "*Earnings preview Credit costs in focus in AmEx 4Q*" reported that analysts "largely expect credit losses to remain elevated through 2009." In turn, "AmEx has said that it expects write-offs in its credit card portfolio to increase in the fourth-quarter and into this year."

187.     Robert Lutts, president and chief investment officer of Cabot Money Management cautioned that "[i]t's very likely American Express will have a loss one quarter or more in the coming year."

188.     Recognizing the austerity of the weakening economy, numerous analysts have lowered their price targets for the Company Stock to its lowest prices in the past decade. On March 11, 2009, for example, Citigroup analyst Donald Fandetti cut his earnings estimate and price target for the Company Stock to $9 from $14 "amid concern that mounting credit losses will likely force the credit card lender to take sizable reserves in the coming quarters and potentially cut its dividend."

189.     Analyst reports from Friedman, Billings, Ramsey further cautioned that the Company:

> [M]ay post a loss in 2009 and 2010, hurt by growing unemployment levels and rising credit card defaults…
>
> Despite the capital cushion, AmEx shares are expected to underperform its peers given its premium valuation and on likely further downward revisions to consensus estimates…
>
> We believe [losses in the U.S. credit card segment] will significantly impair AmEx's ability to report a profit in [years

2009 and 2010].

190.    Accordingly, Friedman, Billings, Ramsey analysts cut their price target on the Company Stock to $10 per share from $12 and maintained their "underperform" rating on the stock.

191.    Amidst the Company's job cuts, financial losses, and $3.39 billion bailout from the U.S. Treasury, the value of the Company Stock has plummeted during the Class Period, sinking to a closing price of $12.81 per share on March 30, 2009.   Having traded at $58.95 per share on April 19, 2007, the Company Stock has already lost over 78% of its value during the Class Period, a loss that has significantly reduced the overall value of the Plan's assets and Participants' vested retirement benefits.   Despite projections of additional financial losses and declines in the value of the Company Stock, Defendants continue to maintain the Company Stock Fund as a retirement savings option in the Plan.

### C.    Defendants Knew or Should Have Known that the Company Stock was an Imprudent Retirement Saving Asset for the Plan

192.    At all relevant times, Defendants knew or should have known that the economy was deteriorating and that the Company would be susceptible to drastic declines in consumer credit spending, which made the Company Stock an imprudent retirement saving asset for the Plan.

193.    Defendants had direct knowledge of the weakening economy and declines in nationwide consumer credit spending.   In the above press releases issued by American Express on January 28, 2008 and October 20, 2008, Defendant Chenault admitted that the Company had seen "clear signs" of a weakening environment earlier in the year.

194.    Defendants, however, failed properly to take into account the weakening credit environment and deteriorating financial market which put the Company Stock at risk, or to

properly consider the affect of the above on the Company's financial growth and stock value when determining the prudence of investing and holding the Plan's assets in the Company Stock.

195.     As a result of Defendants' direct knowledge of and, at times, role in, creating and/or maintaining public misconceptions concerning the true financial health and growth potential of American Express, which Defendants failed to disclose, any generalized warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's holding in the Company Stock did not effectively inform participants of the past, immediate, and future dangers of saving for their retirements in the Company Stock Fund.

196.     The Administration Committee, responsible for  the operation and administration of the Plan and communication with participants and beneficiaries, either failed to uncover, or uncovered but failed to disclose, the true affect of the deterioration and volatility in the financial market was exerting on the Company's current and future financial health.  In other words, the Administration Committee failed to provide the Plan's participants with complete and accurate information so that they could make informed decisions regarding investing in the Company Stock Fund.

197.     The Investment Committee, responsible for selection and monitoring of Plan assets solely in the best interest of the Plan's participants and beneficiaries, failed to consider whether the Company Stock was a prudent retirement asset for the Plan in the first instance and, upon information and belief, never monitored the performance of the same, despite the acknowledged affect the aforementioned dislocations were having on the Company's business, for purposes of recommending either the levels of Company Stock held in the Plan or for the elimination of Company Stock as a retirement saving option.  Indeed, at all relevant times, the

Investment Committee failed to consider whether to continue to offer or hold Company Stock as a Plan asset served the best interests of Plan participants and beneficiaries.

198.     At the same time, American Express, Director Defendants, the Compensation Committee, the Administration Committee and the Investment Committee failed adequately to review the performance of the other fiduciary Defendants to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

199.     Defendants also knew or reasonably should have known that the amount of Plan assets allocated to the Company Stock Fund on or after July 1, 2007, greatly exceeded the 10% limitations established under the 2007 Plan amendments, but they failed to take adequate action to comply with the 10% limitations specified in the amended Plan.

200.     An adequate investigation by the Director Defendants, the Compensation Committee, the Administration Committee and/or the Investment Committee would have revealed to a reasonable fiduciary that holding the Company Stock in the Plan, under these circumstances where the Company was heavily exposed to losses in its credit businesses, was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect Plan participants and beneficiaries against unnecessary loss, and would have made different decisions.  Because Defendants knew or should have known that the Company Stock was not a prudent retirement savings asset for the Plan, they had an obligation to protect the Plan, its participants and beneficiaries from unreasonable and entirely predictable losses incurred as a result of the Plan's holdings in the Company Stock.

201.     Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of some or all of its shares of the Company Stock; discontinuing all further Participant elective contributions in

the Company Stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as fiduciaries of the Plan to the extent that as a result of their employment by American Express they could not loyally serve the Plan's participants in connection with the Plan's acquisition and holding of the Company Stock.

202.    Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of the Plan's holdings in the Company Stock Fund.  In fact, the Defendants continued to allow the Plan and Plan participants to acquire and hold the Company Stock even as the Company's financial losses came to light.

**D.    Defendants Regularly Communicated Defendants Regularly Communicated with the Plan's Participants Concerning Their Holdings in the Company Stock, Yet Failed to Disclose the Imprudence of Company Stock As A Retirement Saving Asset**

203.    Defendants regularly communicated with employees, including the Plan's participants, about the Company's performance, future financial and business prospects, and the Company Stock.  During the Class Period, the Company fostered a positive attitude toward the Company Stock as an asset for the Plan, and/or allowed the Plan's participants to follow their natural bias towards saving for their retirements with Company Stock by, *inter alia*, failing to disclose negative material information.  As such, the Plan's participants could not appreciate the true risks presented by investments in the Company Stock and therefore could not make informed decisions regarding such holdings in the Plan.

204.    Moreover, after Plan participants failed to reduce the amounts of their allocations to the Company Stock Fund to comply with the 10% limitations established by the 2007 Plan amendment, Defendants failed to communicate adequate reminders or other instructions or information to Plan participants to ensure that they reduced their allocations to the Company

Stock Fund to comply with the 10% limitation in the amended Plan.

## VII.    CONDUCT CONSTITUTING DEFENDANTS' FIDUCIARY BREACHES

205.    ERISA mandates that pension plan fiduciaries have a duty of loyalty to the Plan, its participants and beneficiaries which includes the duty to speak truthfully to the Plan, its participants and beneficiaries when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and Beneficiaries.  "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996).

206.    Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured.  *See, e.g., Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001) ("[An] ERISA fiduciary that knows or should have known that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent – especially when that misunderstanding was fostered by fiduciary's own material representations or omissions."); *Matthews v. Chevron Corp.*, 362 F.3d 1172, 1180 (9th Cir. 2004); *Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir. 1993); *In re JDS Uniphase Corp. ERISA Litigation*, 2005 WL 1662131 (N.D. Cal. 2005).

207.    A plan fiduciary also "has an affirmative duty to inform beneficiaries of circumstances that [as alleged herein] threaten the funding of benefits." *Acosta v. Pacific Enter.*, 950 F.2d 611, 619 (9th Cir. 1991).

208.    Defendants made direct and indirect communications with the Plan's participants including statements regarding saving for retirement with Company Stock.   These communications included, but were not limited to, SEC filings, annual reports, press releases,

and Plan documents (including Summary Plan Descriptions ("SPDs") and/or prospectuses regarding Plan/participant holdings of Company stock), which included and/or reiterated these statements.  At all relevant times during the Class Period, the Company's SEC filings were incorporated by reference into the SPDs.  Defendants acted as fiduciaries to the extent of this activity.

209.    Defendants breached their fiduciary duties by making direct and indirect communications with Plan participants and beneficiaries in their fiduciary capacity which contained false or misleading statements that Defendants knew or should have known were untrue or inaccurate.  These communications included statements regarding the Company's earnings, and its profitability as alleged herein that were contained in the documents specifically incorporated into the SPD, including Form 10-K annual reports, Form 10-Q quarterly reports, and Form 8-K periodic reports, and the Plan's annual reports on Form 11-K.  No Defendant took any action to remedy the breaches set forth in this paragraph.

210.    Defendants breached their fiduciary duty to manage the Plan and Plan assets in accordance with the terms of the Plan (as amended in 2007), failed to ensure that Plan participants adhered with the 10% limitations on ongoing and total contributions established by the 2007 Plan amendments, and failed to reallocate Plan participants' non-conforming ongoing and total allocations to the Company Stock Fund.

211.    Further, Defendants, as the Plan's fiduciaries, knew or recklessly disregarded certain basic facts about the characteristics and behavior of the plan participants and beneficiaries, well-recognized in the 401(k) literature and the trade press,[16] including:

---

[16] *See, e.g.*, Joanne Sammer, *Managed Accounts: A new direction for 401(k) plans*, Journal of (continued…)

a.      Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

b.      Out of loyalty, employees tend to invest in company stock;

c.      Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

d.      Employees tend not to change their investment option allocations in the plan once made;

e.      No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

f.      Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk;

g.      Many employees do not recognize their exposure to massive loss from failing to diversify their retirement savings; and

h.      Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

212.    Thus, any warnings of market and diversification risks that Defendants made to Plan participants regarding Company Stock as a means of saving for retirement did not effectively inform the Plan participants of the past, immediate, and future risk of investing in Company Stock.

---

(…continued)

Accountancy, Vol. 204, No. 2 (August 2007) (available at: http://www.aicpa.org/pubs/jofa/aug2007/sammer.htm); Roland Jones, *How Americans Mess Up Their 401(k)s*, MSNBC.com (June 20, 2006) (available at: http://www.msnbc.msn.com/id/12976549/); Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at: http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plan - the importance of plan design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at:  http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

213.    Even though Defendants knew of the significant concentration of the Plan's assets in Company Stock, they still disseminated inaccurate, incomplete and materially misleading statements Plan-wide regarding the Company's financial and operational health and future prospects, and/or did nothing to correct such statements.

214.    ERISA also imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  Defendants breached their duties to manage the Plan's assets prudently and loyally because, during the Class Period, Defendants knew or should have known that Company Stock was not a prudent retirement asset for the Plan and knew or should have known that the value of Company Stock was exposed to an unacceptable risk of loss.

215.    Throughout the Class Period, Defendants knew or should have known the Company Stock was an imprudent retirement asset in the Plan.  Nonetheless, Defendants permitted the Company Stock Fund to be offered as a retirement saving option in the Plan, did essentially nothing to reduce the number of shares held by the Plan or provide Plan participants with any meaningful option to reduce the number of shares of Company Stock in their accounts.

216.    No Defendant conducted an investigation into whether Company Stock was a prudent retirement saving option for Plan participants during the Class Period despite the fact that material adverse information was concealed from the investing public, and that at any relevant time, Company Stock constituted between approximately one-quarter to one-third of the value of Plan assets.  Moreover, no Defendant provided Plan participants with adequate information regarding the true nature and extent of the Company's exposures, such that Plan participants could make informed decisions whether to allocate their Plan contributions to Company Stock as a means of saving for retirement.

217.    On a Plan-wide and Class-wide basis, the risk of an undiversified investment in

Company Stock imposes a greater risk than that of other undiversified investments.  Thus, the risk associated with allocating Plan contributions to the Company Stock Fund during the Class Period was extraordinary, far above and beyond a prudent level of risk associated with retirement saving.  This abnormal investment risk could not have been known by the Plan's participants.

218.   Defendants had a heightened duty with regard to both the decision to continue investing in the Company Stock Fund as well as the duty to inform participants concerning the imprudence of investing in the Company Stock Fund.   Ultimately, it was imprudent for Defendants to continue to offer the Company Stock Fund as a retirement savings option, and that it was imprudent for Plan fiduciaries to continue to hold Plan assets in Company Stock through the Company Stock Fund.

219.   Defendants breached their fiduciary duties when they: (i) failed to conduct an appropriate investigation into whether Company Stock was a prudent retirement saving option; (ii) failed to develop appropriate guidelines for allocating retirement contributions to the Company Stock Fund; (iii) failed to divest the Plan of Company Stock; (iv) failed to discontinue further allocation of retirement contributions to Company Stock in the Plan; (v) failed to remove Company Stock as a retirement saving option in the Plan; (vi) failed to halt the holding of Plan assets in Company Stock; (vii) failed to consult with or appoint independent fiduciaries regarding the appropriateness of Company Stock as a retirement saving option; (viii) failed to disclose sufficient information about the Company's financial condition and prospects to permit Plan participants to make informed decisions whether to allocate retirement contributions to the Company Stock Fund in the Plan; and (ix) failed to resign as fiduciaries of the Plan, if as a result of their employment by American Express, they could not loyally serve the Plan and its participants.

220.     The Director Defendants failed in their fiduciary responsibilities in monitoring the Compensation Committee Defendants, the Administration Committee Defendants, the Investment Committee Defendants or Defendant Dwyer (including any additional "John Doe" Defendants).

221.     The Director Defendants breached their fiduciary duties because they did not have procedures in place so that they could review and evaluate on an ongoing basis whether the Compensation Committee Defendants, the Administration Committee Defendants, the Investment Committee Defendants or Defendant Dwyer (including any additional "John Doe" Defendants) were performing their duties adequately and in accordance with ERISA's fiduciary provisions.

222.     The Director Defendants failed adequately to review the performance of the Compensation Committee Defendants or the Benefit Committee Defendants (including any additional "John Doe" Defendants) to: (i) ensure that they were fulfilling their fiduciary duties under the Plan and ERISA; (ii) ensure that they had adequate information to do their job of overseeing the Plan's assets; (iii) ensure that they had adequate access to and use of impartial advisors when needed; and (iv) ensure that they reported regularly to the Board.

223.     The Director Defendants breached their fiduciary duties to remove the Compensation Committee Defendants, the Administration Committee Defendants, the Investment Committee Defendants or Defendant Dwyer (including any additional "John Doe" Defendants) when they knew they had breached their fiduciary duties.

## VIII.   CLAIMS FOR RELIEF UNDER ERISA

224.     At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

225.     ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil

action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

226.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

227.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A), (B) and (D), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. (Emphasis added.)

228.    These fiduciary duties under ERISA § 404(a)(1)(A), (B) and (D) are referred to as the *duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law." They entail, among other things:

    a.    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

    b.    A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

    c.    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and

accurate information material to the circumstances of participants and beneficiaries; and

d.   The duty to follow plan documents to the extent consistent with ERISA's other fiduciary duties.

229.   ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

230.   Plaintiffs therefore bring this action under the authority of ERISA §502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## IX.   CAUSATION

231.   The Plan suffered at least tens of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties.  These losses were reflected in the diminished account balances of the Plan's participants.

232.   The Plan and Plan participants lost more than $130 million on the shares of Company Stock in the Plan in excess of 10% of the Plan assets as a result of the sharp decline in the market price for the shares of Company Stock in the Company Stock Fund.

233.     Defendants are responsible for losses caused by participants' failure to exercise voluntary diversification options because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the retirement saving decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  By failing to apprise participants of the problems within the Company and of the fact that the Company stock price was artificially inflated, as further described *infra*, Defendants misrepresented the soundness of the Company Stock as a retirement saving option.  As a consequence, participants did not exercise independent control over their retirement savings in the Company Stock, and Defendants remain liable under ERISA for losses caused by such allocations.

234.     Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and participants would have avoided a substantial portion of the losses that they suffered through their continued holdings in the Company Stock.

## X.     REMEDY FOR BREACHES OF FIDUCIARY DUTY

235.     As noted above, as a consequence of the Defendants' breaches, the Plan suffered significant losses.

236.     ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

237.     With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and Beneficiaries in the Plan would not have made or maintained their holdings in the challenged

investment and, where alternative investments were available, that the allocations made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

238.    Plaintiffs, the Plan, and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

239.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## XI.    ERISA § 404(C) DEFENSE INAPPLICABLE

240.    The Plan suffered losses, and the Plaintiffs and the other Class members suffered losses, because substantial assets in the Plan were invested in American Express stock during the Class Period in violation of the Defendants' fiduciary duties.

241.    As to contributions invested in Company stock, Defendants were responsible for the prudence of retirement savings options provided under the Plan during the Class Period, unless the Plan satisfied the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

242.     Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the selection of imprudent retirement savings options for the Plan.  In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions.  In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], and that fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participants or Beneficiary."  29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(i).

243.     As alleged above, Defendants failed to provide participants with complete and accurate information regarding the true financial condition of American Express and the prudence of such a heavy concentration of Plan assets in the Company Stock Fund. Accordingly, participants failed to exercise the requisite independent control over their holdings in Company Stock in the Plan.

244.     In addition, § 404(c) does not apply to any portion of the Plan (a) derived from Company matching or profit-sharing contributions as those contributions were made by or at the sole discretion of the Company or (b) deemed an ESOP in that the Secretary of Labor has interpreted the provision to apply only to plan that provide plan participants with a full range of investment options, which an ESOP by its very nature does not.  *See* 29 C.F.R. § 2550.404c-1 (1996); *Herman v. Nationsbank Trust Co*., 126 F.3d 1354, 1361 (11th Cir. 1997).  Under the terms of the Plan, Company contributions were automatically initially allocated to the Company Stock Fund; thus, participant control was restricted.

245.     The Defendants' liability to the Plan, Plaintiffs and the Class for relief stemming from the Plan's imprudent holdings in Company Stock, is established upon proof that such

retirement assets were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

## XII.   CLASS ACTION ALLEGATIONS

246.   ***Class Definition***.  Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiffs and the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants, who were participants in or beneficiaries of the Plan at any time between April 19, 2007, and the present, and who allocated Plan contributions to the Company Stock Fund.

247.   ***Numerosity***.  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery.  The Plan's 2006 Form 5500 states there were 36,434 Plan Participants as of year end 2006, and it can reasonably be assumed that most of those Participants remain Participants until at least of the beginning the Class Period (April 19, 2007) and held at least some Company stock in their Plan accounts.

248.   ***Commonality***.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;

b.      whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

c.    whether Defendants violated ERISA; and

d.    whether the Plan has suffered losses and, if so, what measure of damages is proper.

249.    ***Typicality***.  Plaintiffs' claims are typical of the claims of the members of the Class because: (a) to the extent Plaintiffs seek relief on behalf of the Plan pursuant to ERISA § 502(a)(2), their claim on behalf of the Plan is not only typical to, but identical to a claim under this section brought by any Class member; and (b) to the extent Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of themselves for equitable relief, that relief would affect all Class members equally.

250.    ***Adequacy***.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

251.    ***Rule 23(b)(1)(B) Requirements***.  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

252.    ***Other Rule 23(b) Requirements***.  Class action status is also warranted under the other subsections of Rule 23(b) because:  (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect

to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### Failure to Manage the Plan's Assets Pursuant to Plan Documents (Breach of Fiduciary Duty in Violation of ERISA §§ 404(a)(1)(D) and 405  By All Defendants)

253.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

254.    At all relevant times, as alleged above, all Defendants were Plan fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they were named fiduciaries by the Plan or they possessed or exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

255.    Under ERISA § 404(a)(1)(D), Defendants were required to discharge their duties solely in the interest of the Plan and Plan participants in accordance with the documents and instruments governing the Plan, insofar as such Plan documents and instruments are or were consistent with the other provisions of ERISA.

256.    Beginning on or after July 1, 2007, the 2007 Plan amendment restricted the amounts that Plan participants could allocate to the Company Stock Fund to no more than 10% of their ongoing contributions *and* no more than 10% of their total retirement account assets. Thus, in accordance with the 2007 Plan amendment, no more than 10% of the total amount of Plan assets could be allocated to the Company Stock Fund as of July 1, 2007, or within a reasonable time thereafter.

257.    Beginning on or after July 1, 2007, under ERISA § 404(a)(1)(D), Defendants were required by the 2007 Plan amendment to limit Plan participants' allocations to the

Company Stock Fund to no more than 10% of their ongoing contributions and no more than 10% of their total retirement assets.  Consequently, beginning on or after July 1, 2007, under ERISA § 404(a)(1)(D), Defendants were required by the 2007 Plan amendments to ensure that no more than 10% of the ***Plan's*** overall assets were allocated to the Company Stock Fund.

258.   Defendants failed to discharge their duties in accordance with the Plan as amended in 2007 by failing to (a) restrict the amounts that Plan participants allocated to the Company Stock Fund to no more than 10% of their ongoing retirement contributions; (b) restrict the amounts allocated by Plan participants to the Company Stock Fund to no more than 10% of their total retirement contributions; (c) reallocate contributions by Plan participants who allocated more than 10% of their ongoing contributions to the Company Stock Fund; (d) reallocate Plan assets to reduce the total amounts allocated by Plan participants to the Company Stock Fund to no more than 10% of total Plan assets; or (e) reallocate the Plan's assets to reduce the total amount of the Company Stock Fund in the Plan to no more than 10% of the overall amount of Plan assets.

259.   As a result of Defendants' failure to discharge their duties in accordance with the 2007 Plan amendment, the Plan and Plan participants held significantly more than 10% of its assets in the Company Stock Fund on July 1, 2007, and for a substantial period of time thereafter.

260.   By failing to discharge their duties in accordance with the 2007 Plan amendment, Defendants breached their fiduciary duties under ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

261.   Had Defendants discharged their duties in accordance with the 2007 Plan amendment beginning on July 1, 2007, or within a reasonable time thereafter, the Plan and Plan

participants would not have incurred losses in excess of $130 million on the shares of Company Stock in the Plan in excess of 10% of the Plan assets as a result of the sharp decline in the market price for the shares of Company Stock in the Company Stock Fund.

262.   As a direct and proximate result of Defendants' breach of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement savings.

263.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Prudently and Loyally Manage the Plan's Assets (Breaches of Fiduciary Duties in Violation of ERISA §§ 404(a)(1)(B) and 405 by All Defendants)

264.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

265.   At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

266.   Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that retirement savings options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all retirement assets in the Plan, including assets in the Company Stock Fund, were prudent and that such assets were consistent with the purpose

of the Plan.  Defendants are liable for losses incurred as a result of such retirement assets being imprudent.

267.    The Company Stock was not a prudent retirement asset for the Plan accounts because, throughout the Class Period, the Company was exposed to huge financial losses and diminution in the value of its stock as a result of being heavily dependent on consumer credit card spending while the economy was weakening and while nationwide consumer credit card spending was sharply declining.  American Express was also exposed to huge financial losses because of its own poor underwriting practices prior to and during the Class Period, including extending credit cards to persons with multiple mortgages and assuming a substantial and increased exposure to credit card customers in California and Florida, markets which have been the epicenter of the housing market collapse in the United States.  These factors have led to the market price of the Company Stock being artificially inflated during the Class Period and have led to massive losses to the Plan and the Plan's participants.

268.    In particular, in light of the 2007 Plan amendment as well as the other facts alleged herein, Defendants knew or should have known that on and after July 1, 2007, it was not consistent with the reasonable expectations of the Company as settlor of the Plan for Defendants to: (a) allow unrestricted or unlimited contributions or allocations of retirement savings to the Company Stock Fund; or (b) hold more than 10% of the Plan's assets in the Company Stock Fund.  Thus, by disregarding the 10% limitations (ongoing and total) established by the 2007 Plan amendment on and after July 1, 2007, Defendants failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in conducting similar business.

269.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents

or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

270.    Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period these Defendants knew or should have known that the Company stock was not a suitable and appropriate asset for the Plan as described herein. Holding Company Stock during the Class Period clearly did not serve the Plan's purpose of helping participants save for retirement, and in fact caused significant losses/depreciation to participants' retirement savings.

271.    During the Class Period, despite their knowledge of the imprudence of the Company Stock as a retirement asset, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

272.    The Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company Stock.   Defendants had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy the same.

273.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a

significant portion of their retirement savings.

274. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Failure to Adequately Inform the Plan's Participants About
### The True Risk and Return Characteristics of American Express Stock
### (Against All Defendants)

275. Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

276. During the Class Period Defendants failed to adequately inform the Plan's Participants about the true risk and return characteristics of American Express stock as required by ERISA.

277. During the Class Period, Defendants issued to Participants SPDs and other written communications, including SEC filings, which failed to disclose, among other things, the facts that;

    a.    The Company was exposed to huge financial losses as a result of being heavily dependent on consumer credit card spending while the economy was weakening and while nationwide consumer credit card spending was sharply declining; and

    b.    The Company was also exposed to huge financial losses because of its own poor underwriting practices, including extending credit cards to persons with multiple mortgages and assuming a substantial and increased exposure to credit card customers in California and Florida, markets which have been the epicenter of the housing market collapse in the United States.

278. Communications to participants not only failed to reveal the Company's exposure to huge financial losses, but those communications consistently portrayed the Company as being "on track," maintaining strong credit quality, and expressing other positive information which was inconsistent with the true state of affairs within American Express.

279.    The market price of the Company Stock was artificially inflated as a result of the concealment from the market and the Plan Participants of the Company's exposure to huge financial losses resulting from macroeconomic conditions and also from the Company's own poor underwriting practices and imprudent judgments.

**COUNT IV**

**Failure to Adequately Monitor Other Fiduciaries and
Provide Them with Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA § 404
by American Express and the Monitoring Defendants)**

280.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

281.    At all relevant times, as alleged above, American Express and the Monitoring Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

282.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of American Express and the Monitoring Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including the members of the Committees.

283.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, American Express and the Monitoring Defendants, had the duty to:

a.    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

b.    Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

c.    Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

d.    Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

e.   Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

f.   Ensure that the monitored fiduciaries report regularly to the Company and/or Monitoring Defendants. The Company and/or Monitoring Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

284.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

285.   American Express and the Monitoring Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement asset, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant concentration of the retirement savings of rank and file employees in Company Stock, an asset that was imprudent and subject to inevitable and significant depreciation. American Express and the Monitoring Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plan to continue offering American Express stock as an investment alternative for the Plan, (ii) continuing to invest the assets of the Plan in Company Stock when it no longer was prudent to do so, and (iii) failing to restrict Plan participants' contributions to the Company Stock Fund in accordance with the 2007 Plan amendment and to limit the total amount of Plan assets allocated to the Company Stock Fund in accordance with the 2007 Plan

amendment.  Despite this knowledge, American Express and the Monitoring Defendants failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

286.    In addition, American Express and the Monitoring Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of American Express that they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

287.    American Express and the Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

288.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement savings.

289.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

### COUNT V

**Breach of Duty to Avoid Conflicts of Interest**
**(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by the**
**Monitoring Defendants and Committees Defendants)**

290.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

291.    At all relevant times, as alleged above, the Monitoring Defendants and Committees Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

292.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

293.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's holdings in the Company's own securities; and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's holdings in the Company Stock.

294.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tens of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement assets.

295.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE,** Plaintiffs demands judgment against Defendants, jointly, severally, or individually, as follows:

A.      A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.      A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(l)(B);

C.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent management of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.      An Order requiring Defendants to discontinue participant contributions to the Company Stock Fund, and to transfer existing balances in the Company Stock Fund to alternative retirement savings options under the Plan;

E.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

F.      An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

G.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts as benefits due in proportion to the accounts' diminution in value;

H.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.    An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated: New York, New York
      March 22, 2010

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

By:    _____

Mark C. Rifkin (MR-0904)
rifkin@whafh.com
Malcolm T. Brown
brown@whafh.com
270 Madison Avenue
New York, New York 10016
Tel:  (212) 545-4600
Fax: (212) 545-4653

Robert I. Harwood
rharwood@hfesq.com
Jeffrey M. Norton
jnorton@hfesq.com
Roy Shimon
rshimon@hfesq.com
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, New York 10022
Tel:  (212) 935-7400
Fax: (212) 753-3630

Edwin J. Mills
emills@ssbny.com
Michael J. Klein
mklein@ssbny.com
**STULL STULL & BRODY**
6 East 45th Street
New York, New York 10017
Tel: (212) 687-7230
Fax: (212) 490-2022

*Interim Co-Lead Class Counsel*
*Attorneys for Plaintiffs and the Class*

Lee Squitieri
Stephen J. Fearon, Jr.
**SUITIERI & FEARON LLP**
32 East 57th Street, 12th Floor
New York, New York 10022

Frank J. Johnson
Francis A. Bottini, Jr.
**JOHNSON & BOTTINI, LLP**
655 West Broadway, Suite 1400
San Diego, California 92101

Gary Steven Graifman
**KANTROWITZ GOLDHAMER &**
  **GRAIFMAN, P.C.**
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977

Major Khan
**MAJOR KHAN LLC**
20 Bellevue Street
Weehawken, New Jersey 07086

*Attorneys for Plaintiffs*

/572177

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMERICAN EXPRESS ERISA LITIGATION | MASTER FILE: 08-CV-10834 (JGK) |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | |

## CERTIFICATE OF SERVICE

Marc C. Rifkin hereby certifies that, on March 22, 2010, true and correct copies of the

Second Consolidated Amended Complaint for Violations of the Employee Retirement Income

Security Action were caused to be served by email and first class mail upon the following

counsel:

Evan Glassman
eglassman@steptoe.com
Steptoe & Johnson LLP
750 Seventh Avenue
New York, NY 10019

Morgan D. Hodgson
mhodgson@steptoe.com
Paul J. Ondrasik
pondrasik@steptoe.com
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036

Dated: New York, New York
          March 22, 2010

MARC C. RIFKIN

/543113