UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

─────────────────────────────────

IN RE AMERICAN EXPRESS COMPANY ERISA
LITIGATION,

                    **Defendant.**

─────────────────────────────────

08 Civ. 10834 (JGK)
08 Civ. 11301 (JGK)
09 Civ. 1017 (JGK)
09 Civ. 1202 (JGK)

MEMORANDUM OPINION AND
ORDER

**JOHN G. KOELTL, District Judge:**

During the recent drop in the stock market, the price of
American Express Company ("American Express") stock dropped
significantly, although it has since rebounded.  The American
Express Incentive Savings Plan (the "Plan") required that the
Plan include an option to allow employees to invest in the
Company Stock Fund, which is invested almost exclusively in
American Express stock.  The plaintiffs, participants and
beneficiaries of the Plan, claim that the various defendants
were responsible for the Plan's investments and breached their
fiduciary duties by failing to limit the Plan's investments in
American Express stock, and otherwise violated their fiduciary
duties under the Employee Retirement Income Security Act of 1974
("ERISA"), 29 U.S.C. § 1001, et seq.

The defendants now move to dismiss the Complaint.  They
argue, among other things, that the Plan required that the
employees be permitted to invest in the Company Stock Fund and
that they breached no duties in following the Plan requirements.

More specifically, the plaintiffs, Renee Obester, Charlotte Fairclough, Kam K. Tang, Ida DiLorenzo, and Alan Miner (collectively, "the plaintiffs") are American Express employee participants in or beneficiaries of the Plan.  They brought these actions on behalf of themselves and others similarly situated to recover losses suffered by the Plan from April 19, 2007, to the present.  The plaintiffs allege that the defendants American Express, American Express Company Compensation and Benefits Committee ("the Compensation Committee"), Employee Benefits Administration Committee of the Company ("the Administration Committee"), Benefits Plans Investment Committee of the Company ("the Benefits Committee"), Retirement Savings Plan Investment Committee ("the Investment Committee"), and individual corporate officers of American Express[1] (collectively, "the defendants"), violated their fiduciary duties to the plaintiffs under ERISA.

The Plan is a defined contribution plan or individual account plan consisting of contributions made by employees and the employer, American Express.  The Plan offers participants a

---

[1] The individual defendants are as follows:  (1) the Director or Monitoring Defendants—Kenneth I. Chenault ("Chenault"), Daniel F. Akerson ("Akerson"), Charlene Barshefsky ("Barshefsky"), Ursula M. Burns ("Burns"), Peter Chernin ("Chernin"), Jan Leschly ("Leschly"), Richard C. Levin ("Levin"), Richard A. McGinn ("McGinn"), Edward D. Miller ("Miller"), Steven S. Reinemund ("Reinemund"), Robert D. Walter ("Walter"), and Ronald A. Williams ("Williams"); (2) the Compensation Committee Defendants—Leschly, McGinn, Miller, Walter, and Chernin; (3) the Administration Committee Defendants— Valeria M. Christansen ("Christansen"), and various unknown John Doe defendants; (4) the Investment Committee Defendants—Jim Dwyer ("Dwyer"), and various unknown John Doe defendants.

variety of investment options, and participants are solely responsible for determining how contributions are invested among the available options.  The Plan mandates that it shall include the Company Stock Fund, invested exclusively in American Express stock plus limited liquid investments necessary to meet liquidity needs.  Beginning July 1, 2007, the Plan has imposed a 10% ceiling on participant investments in the Company Stock Fund.

American Express, a consumer credit card company, has suffered losses as consumer spending declined during a period of economic recession.  As has been the case with other companies during economic troubles, the value of American Express stock has decreased from a trading price of $58.50 per share on April 19, 2007, to a closing price of $18.42 per share on December 22, 2008, resulting in a reduction in value of the plaintiffs' vested retirement benefits.  American Express announced on October 20, 2008, that it planned to reduce its workforce by 10%.  On November 10, 2008, American Express was approved to become a bank-holding company, a status it sought in order to obtain access to Federal Reserve financing.

The plaintiffs allege five separate claims for violations of ERISA.  The plaintiffs allege that the defendants violated their fiduciary duties of prudence and loyalty under ERISA by continuing to maintain the Company Stock Fund while failing to

warn the plaintiffs that investment in company stock was imprudent.  The plaintiffs also allege that the defendants violated ERISA by failing to reallocate Plan assets to reduce the total amount in the Company Stock Fund to no more than 10% of each participant's holdings as well as the overall amount of Plan assets after the 2007 Plan amendment.  The plaintiffs bring further claims for failure to inform the plaintiffs adequately, failure of American Express and various defendants to monitor other fiduciaries, and breach of duty by various defendants to avoid conflicts of interest.  The defendants now move to dismiss the Second Consolidated Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Arista Records LLC v. Lime Group LLC, 532 F. Supp. 2d 556, 566 (S.D.N.Y. 2007).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is

legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d
Cir. 1985).  The Court should not dismiss the complaint if the
plaintiff has stated "enough facts to state a claim to relief
that is plausible on its face." Bell Atl. Corp. v. Twombly, 550
U.S. 544, 570 (2007).  "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the
misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949
(2009).  While the Court should construe the factual allegations
in the light most favorable to the plaintiff, "the tenet that a
court must accept as true all of the allegations contained in
the complaint is inapplicable to legal conclusions." Id.; see
also McKevitt v. Mueller, 689 F. Supp. 2d 661, 665 (S.D.N.Y.
2010).

When presented with a motion to dismiss pursuant to Rule
12(b)(6), the Court may consider documents that are referenced
in the complaint, documents that the plaintiff relied on in
bringing suit and that are either in the plaintiff's possession
or that the plaintiff knew of when bringing suit, or matters of
which judicial notice may be taken.  See Chambers v. Time
Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002); see also
Kavowras v. New York Times Co., 328 F.3d 50, 57 (2d Cir. 2003);
Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002);
Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.

1993); <u>Cortec Indus., Inc. v. Sum Holding L.P.</u>, 949 F.2d 42, 47-48 (2d Cir. 1991); <u>Kramer v. Time Warner, Inc.</u>, 937 F.2d 767, 773 (2d Cir. 1991); <u>McKevitt</u>, 689 F. Supp. 2d at 665.

## II.

The Court accepts the following factual allegations for the purposes of the motion to dismiss.

### A.

The plaintiffs are individual participants in the Plan who held American Express stock in their individual Plan accounts during the class period. (Second Consol. Am. Compl. ("Compl.") ¶¶ 20-23.) American Express, the Plan Sponsor and named fiduciary, is a New York company that offers consumer and business credit cards among other financial products. (Compl. ¶¶ 25-27, 106.)

The Director or Monitoring Defendants—Chenault, Akerson, Barshefsky, Burns, Chernin, Leschly, Levin, McGinn, Miller, Reinemund, Walter, and Williams—were members of the American Express Board of Directors during the class period. (Compl. ¶¶ 28-40.) The plaintiffs allege that the Director Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A),

29 U.S.C. § 1002(21)(A), because they allegedly "exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets" and "were ultimately responsible for monitoring and administering the Plan." (Compl. ¶¶ 41-42.)

The named fiduciaries of the Plan subject to ERISA are the Administration Committee, the Benefits Committee, and the Investment Committee. (Compl. ¶¶ 45-46, 51, 81-85.) The Compensation Committee Defendants—Leschly, McGinn, Miller, Walter, and Chernin—appointed members of the Administration Committee. (Compl. ¶ 44.)

The Administration Committee Defendants—including Christensen and various John Doe defendants—as members of the Administration Committee, were "charged with the operation and administration of the Plan." (Compl. ¶¶ 46, 49-50.) Under the Plan, the Administration Committee had the power, duty, and discretion to administer the Plan, determine Plan eligibility, interpret and supplement the Plan when necessary to pursue the intent and purpose of the Plan, decide claims arising out of a denial of Plan benefits, and to make any filings or reports required by ERISA. (Compl. ¶ 47.) The Administration Committee Charter provides that the powers and duties of the Administration Committee include the reporting and disclosure duties of a plan administrator under ERISA, the power to

establish, amend, and terminate administrative rules, the power
and duty to oversee the benefits claims process and decide
claims and appeals, oversee plan operations, employ accounting,
legal, and clerical services needed to discharge its functions,
appoint fiduciaries to aid in fulfilling the Committee's duties,
access American Express records and meet with company employees,
approve clerical Plan amendments, and the power to delegate its
duties and authority.  (Compl. ¶ 48.)  Christensen signed the
2008 11-K on behalf of the Administration Committee and signed
the Form 5500 as the Plan Administrator.  (Compl. ¶ 49.)

The Investment Committee Defendants—including Dwyer and
various John Doe defendants—as members of the Investment
Committee have the "fiduciary responsibility to monitor the
investment of the Plan's assets solely in the interests of the
Plan's participants and beneficiaries," but must do so
"[s]ubject to the terms of the Plan requiring that the Company
Stock Fund be offered as a retirement savings option."  (Compl.
¶¶ 51, 57-59.)  Under the Plan, the Investment Committee had the
power, duty, and discretion to select and monitor the
discretionary funds to be offered as investment options under
the Plan, submit reports regarding the assets, liabilities, and
performance of Plan investments, maintain appropriate records,
and appoint fiduciaries to aid in fulfilling the functions of
the Investment Committee.  (Compl. ¶ 52.)  Under the Statement

of Investment Objectives, the Investment Committee is
responsible for offering a diversified range of funds,
establishing investment objectives, guidelines, and performance
standards, monitoring investment fund managers, and monitoring
the investment program to ensure that it offers a diversified
range of investments.  (Compl. ¶ 53.)  Investment Managers,
appointed by the Investment Committee, are responsible for
"[m]anaging the [fund] assets in accordance with the investment
policy and guidelines as expressed in the fund prospectus or
management agreement with the Plan."  (Compl. ¶ 54 & n.6 (first
alteration in original).)  The Investment Consultant works with
the Investment Committee "to evaluate the investment performance
of all investment options" by advising the Investment Committee
as to the "continuing appropriateness of each investment option"
and recommending modifications of "the overall investment
program including objectives, guidelines or performance
standards for each investment option."  (Compl. ¶ 55.)  Absent
"extraordinary circumstances," the Investment Committee would
not monitor Company Stock performance either for recommending
levels of Company Stock for the Plan or the elimination of
Company Stock as a Plan asset.  (Compl. ¶ 56.)  Dwyer, the Vice
President of Global Benefits at American Express was responsible
for strategy and communication of Plan benefits, and signed the
Form 5500 as the Plan Sponsor.  (Compl. ¶ 60.)

The Plan, first adopted June 11, 1973, is an employee
pension benefit plan under ERISA §§ 3(2)(A), 29 U.S.C.
§ 1002(2)(A) and is intended to be a "source of supplemental
retirement income" for participants.  (Compl. ¶¶ 61, 63, 68.)
The Plan includes a separate individual account for each
participant based on that participant's contributions, and
therefore is a defined contribution plan or individual account
plan under ERISA § 3(34), 29 U.S.C. § 1002(34).  (Compl. ¶ 61.)
The Plan assets were held in trust in accordance with ERISA
§ 403(a), 29 U.S.C. § 1103(a) by various entities during the
class period.  (Compl. ¶ 62.)  On April 4, 2002, the Company
Stock Fund was designated a stock bonus plan composed of an
employee stock ownership plan ("the ESOP").  (Compl. ¶ 65.)  The
Plan was amended effective July 1, 2007, and January 1, 2008.
(Compl. ¶ 66.)  As of July 1, 2007, the ESOP principally held
Company Stock in the Company Stock Fund.  (Compl. ¶ 67.)

Under the Plan, eligible employees are permitted to make
elective contributions and receive various American Express
matching contributions and profit sharing contributions.
(Compl. ¶¶ 69-70.)  Plan participants may, on any business day,
elect to allocate or change contributions to any combination of
funds available under the Plan, including the Company Stock
Fund.  (Compl. ¶ 71.)  The Company Stock Fund consists of
American Express stock and cash or short-term fixed income

investments.   (Compl. ¶ 72.)   The Company Stock Fund is provided

for in a provision of the Plan that states that the "Trust Fund

shall consist in part of the Company Stock Fund."   (Compl. ¶ 73

& Ex. C at § 6.2(a).)   On July 1, 2007, contributions to the

Company Stock Fund were capped at 10% of the total value of a

participant's retirement assets under the Plan, although there

had been no such cap prior to that date.   (Compl. ¶¶ 74-78.)

The Plan amendment reads as follows:

> Notwithstanding anything herein to the
> contrary, no Participant, alternate payee or
> beneficiary may transfer amounts to the
> Company Stock Fund to the extent that such
> transfer would result in the aggregate
> Company Stock holdings of such Participant,
> alternate payee or beneficiary under the
> Plan exceeding ten percent (10%) of the
> total value of his or her Accounts
> (determined at the time of transfer).
> Furthermore, no participant may direct that
> an amount in excess of ten percent (10%) of
> his or her ongoing contributions be
> allocated to the Company Stock Fund.

(Compl. ¶ 78 & Ex. B at § 6.3.)

Likewise, in the Summary of Material Modifications ("SMM")

provided to Plan participants, American Express informed

participants of the following:

> As of the July 1, 2007 [effective date],
> your contributions to the American Express
> Company Stock Fund (the "Fund") will be
> subject to new limits as follows:
>
> • You will not be permitted to make an
>   investment election to contribute

more than 10% of your future
contributions to the Fund.

- If more than 10% of your overall RSP
  balance is held in the Fund, you will
  not be permitted to transfer
  additional monies into the Fund.
- If less than 10% of your overall RSP
  balance is held in the Fund, you will
  be permitted to transfer additional
  monies into the Fund, but only to the
  extent the balance in the Fund after
  the transfer does not exceed 10% of
  your overall RSP balance.

While you are not required to sell or
transfer monies from the Fund, some action
may be required on your part when these new
rules come into effect.  Specifically, if
your current investment election allocates
over 10% of contributions to the Fund, you
need to adjust your election.  If you do not
make a change to limit your contributions to
the Fund to 10% or less, then your election
above the 10% limit will be redistributed
among your other investment elections pro
rata (subject to the RSP's normal
administrative and operational
restrictions).  If you have elected to
direct 100% of contributions to the Fund and
you do not change that election, any future
contributions above the 10% limit will be
directed to the Target Date Retirement Fund
that corresponds closest to the year in
which you will turn 65.

(Compl. ¶ 77 & Ex. H at 6.)  The Administration Committee

procedures likewise track the language of the SMM.  (Compl. ¶ 79

& Ex. J at § 2.)  Plan assets in the Company Stock Fund amounted

to approximately 31% of the total Plan assets on December 31,

2006, and that figure decreased to 24% on December 31, 2007 and

12% on December 31, 2008.  (Compl. ¶¶ 87-90.)

The Investment Committee has authority to invest and manage Plan assets, including the Company Stock Fund, limited only by the 10% cap on Company Stock Fund investments. (Compl. ¶¶ 92-93.)  The Investment Committee did not have the authority to monitor the performance of the Company Stock Fund "[a]bsent extraordinary circumstances." (Compl. ¶ 94.)  Plan participants are 100% vested in contributions made by the participant or American Express matching contributions. (Compl. ¶ 96.)

The Summary Plan Description ("SPD") incorporates by reference various American Express SEC filings. (Compl. ¶¶ 97-98.)  The Director Defendants signed the SEC Form 10-K and Chenault signed certifications to the Securities and Exchange Commission ("SEC") Forms 10-Q certifying that the information in each Form 10-Q was materially accurate. (Compl. ¶ 115.)

**B.**

The plaintiffs allege that throughout the class period, American Express misled Plan participants by representing that its credit business would remain strong while Plan fiduciaries knew or should have known that the company's financial condition was such that investment in American Express stock was an imprudent investment. (Compl. ¶¶ 123-41.)  American Express stock opened at a trading price of $58.50 per share on April 19,

2007, the beginning of the class period.  (Compl. ¶ 125.)  At
the beginning of the class period through May 2, 2008, American
Express consistently reported increased income and consolidated
revenues compared with the prior year.  (Compl. ¶¶ 126-32, 138,
140, 143.)  During this time, the company issued quarterly press
releases stating, among other things, that "[c]redit quality was
very strong," "[c]ontinued growth in Cardmember spending and
excellent credit quality generated strong earnings," referring
to "across-the-board spending growth from consumer, small
business and corporate Cardmembers," "higher spending and
borrowing by consumers and small business," "substantial growth
in owned loan volume."  (Compl. ¶ 126-29, 134, 138 (emphasis
omitted).)  American Express reported that it "would be looking
to capitalize on opportunities to further strengthen [its] lead
in the payments industry at a time when some key competitors may
be cutting back or dealing with weakness in parts of their
business."  (Compl. ¶ 128 (emphasis omitted).)

     While American Express acknowledged the deteriorating
economic climate in the United States, it nevertheless remained
optimistic.  One press release, referring to "strong earnings
growth" and a "strong competitive position," assured investors
that "[w]hile we continue to be cautious about the overall
economy, our ongoing focus on the premium sector and careful
management of loan and investment portfolios allow[s] [American

Express] to maintain strong credit quality that compares favorably to the industry." (Compl. ¶ 129 (emphasis omitted).) American Express claimed that despite "clear signs of a weakening economy," "[r]esults for [2007] met or exceeded all of our long-term financial targets" and "fourth-quarter business volumes and credit indicators continued to be in the top tier of the industry." (Compl. ¶¶ 133-34 (emphasis omitted).) American Express stated its belief that "our focus on the premium sector should help us to weather the current conditions better than many competitors" and reiterated its confidence in the company's ability to meet long-term financial targets. (Compl. ¶¶ 135-36 (emphasis omitted).) By the close of trading on January 28, 2008, the date of the year-end press release, American Express stock closed at $47.40 per share. (Compl. ¶¶ 131, 137.)

On April 24, 2008, American Express issued a press release reporting an 11% increase in consolidated revenues net of interest expenses from one year before, and noted "stronger than expected revenue growth this quarter, despite a weak and uncertain U.S. economy." (Compl. ¶ 138.) The press release claimed that American Express "remain[ed] on track" to meet growth predicted at the beginning of the year, "barring significant deterioration in the economic environment." (Compl. ¶ 139 (emphasis omitted).) By the close of trading on April 24,

2008, American Express stock closed at $45.18 per share.
(Compl. ¶ 141.)

On May 2, 2008, American Express filed its Form 10-Q for
the first quarter of 2008 with the SEC.  (Compl. ¶ 142.)  In its
Form 10-Q, American Express acknowledged that the "combined
impact of [American Express's] credit-related actions in the
United States . . . slower cardmember spending and the current
environmental conditions will likely cause loan growth in the
United States to be slower than the growth assumed in [American
Express's] initial plan."  (Compl. ¶ 142 (emphasis omitted).)
This was the first Form 10-Q filed during the class period to
indicate that American Express might not meet its initial goals.
(Compl. ¶ 143.)

On July 21, 2008, American Express announced that its
income from continuing operations fell 37% during the second
quarter of 2008, down to $655 million from $1.0 billion during
the comparable period of 2007.  (Compl. ¶ 144.)  Net income also
fell 38%, down to $653 million for the second quarter of 2008.
(Compl. ¶ 144.)  The second quarter results included a $600
million addition to U.S. lending credit reserves reflecting a
deterioration of credit indicators beyond American Express's
prior expectation, and a $136 million charge to the fair market
value of American Express's retained interest in securitized
Cardmember loans.  (Compl. ¶ 145.)  American Express also

acknowledged that it was "no longer tracking to our prior forecast of 4-6 percent earnings per share growth" and that the U.S. Card Services Segment's provisions for losses had "increased significantly" from $640 million a year prior to $1.5 billion.  (Compl. ¶¶ 146, 148.)  American Express's July 31, 2008, Form 10-Q filed with the SEC for the second quarter of 2008 made similar disclosures.  (Compl. ¶ 149.)  Later press releases reported that net income and income from continuing operations continued to decline and acknowledged "that consumer and business sentiment is likely to deteriorate further." (Compl. ¶¶ 151-52.)

By October 20, 2008, American Express stock was trading at $24.35 per share.  (Compl. ¶ 153.)  On that day, the company announced plans to cut 10% of its worldwide work force, some 7,000 jobs, in an attempt to cut costs by $1.8 billion in 2009. (Compl. ¶ 154.)

On November 10, 2008, American Express was approved to become a licensed bank-holding company, a status it sought in order to obtain low-cost financing from the Federal Reserve. (Compl. ¶ 155.)  Media reports indicated that the Federal Reserve approved American Express's application to become a licensed bank-holding company in half the normal 45 days because "emergency conditions exist[ed] that justif[ied] expeditious action."  (Compl. ¶ 156.)

The price of American Express stock fell to $19.43 per share on December 19, 2008, when reports emerged that Standard & Poor's had lowered its long-term ratings of American Express, indicating a "negative" outlook.  (Compl. ¶¶ 157-58.)  News reports indicated on December 24, 2008 that American Express would receive $3.39 billion in "bailout" funds from the United States Treasury as part of its $700 billion bank bailout fund.  (Compl. ¶ 159.)  Overall, American Express stock lost over 77% of its value in 2008.  (Compl. ¶ 181.)

Amid negative news reports and decreased income, American Express stock fell to $15.20 per share on January 26, 2009, while Chenault was quoted as remaining "cautious" with regard to the economic outlook of 2009.  (Compl. ¶¶ 165, 183-87.)  On February 19, 2009, the stock reached its lowest closing price since 1996, $12.87 per share.  (Compl. ¶ 167.)  While negative press and analyst reports continued, American Express stock fell to $9.71 per share on March 6, 2009, the lowest level since 1995.  (Compl. ¶ 168, 170-71, 174-80.)  The stock closed at $12.81 per share on March 30, 2009, an over 78% loss in value during the class period beginning on April 19, 2007.  (Compl. ¶ 191.)  The plaintiffs allege that this drop in stock price has "significantly reduced the overall value of the Plan's assets and Participants' vested retirement benefits."  (Compl. ¶ 191.)

The plaintiffs allege that the defendants knew or should have known that investment in the Company Stock Fund was an imprudent retirement investment, and that the defendants breached their fiduciary duties by failing to protect Plan participants from losses to the Company Stock Fund or to disclose the dangers of the Fund to participants.  (Compl. ¶¶ 192-9, 200-03, 205-23.)  The plaintiffs further allege that the defendants were required by the Plan to reduce overall Company Stock Fund assets to 10% of the Plan's total funds after July 1, 2007, but knowingly failed to do so.  (Compl. ¶¶ 199, 204.)

Count I alleges a failure to manage Plan assets in accordance with Plan documents, in violation of the defendants' fiduciary duties under ERISA §§ 404(a)(1)(D) and 405.  Count II alleges a failure to prudently and loyally manage Plan assets in violation of the defendants' fiduciary duties pursuant to ERISA §§ 404(a)(1)(B) and 405.  Count III alleges that the defendants failed to adequately inform Plan participants about the risks associated with the Company Stock Fund.  Count IV alleges failure to adequately monitor by American Express and the Monitoring Defendants in violation of their fiduciary duty under ERISA § 404.  Count V alleges a breach of the duty to avoid a conflict of interest by the Monitoring and Committees Defendants in violation of ERISA §§ 404 and 405.

The defendants seek to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  The plaintiffs oppose the motion.

### III.

Count I of the Complaint alleges that the defendants failed to reduce the assets in the Company Stock Fund to 10% of the total Plan assets as required by the 2007 Plan amendment in violation of their fiduciary duty to manage the Plan in accordance with Plan documents pursuant to ERISA §§ 404(a)(1)(D) and 405, and that, as a result, the plaintiffs incurred losses in excess of $130 million on the shares of Company Stock in the Plan in excess of 10% of the Plan assets.  See 29 U.S.C. §§ 1104(a)(1)(D) & 1105.  Count II alleges that the defendants knew or should have known that the Company Stock Fund was not a prudent investment during the class period, but the defendants failed to protect Plan participants from investing in the Company Stock Fund in violation of their fiduciary duty of prudence and loyalty pursuant to ERISA §§ 404(a)(1)(B) and 405, and that the defendants are liable for the losses incurred by the plaintiffs during the class period.  See 29 U.S.C. §§ 1104(a)(1)(B) & 1105.

The defendants argue that Counts I and II must be dismissed because the defendants had no fiduciary duties with respect to the Plan's investment in the Company Stock Fund, and that even if the defendants had such fiduciary duties, the Complaint fails to allege facts sufficient to support a claim that the Plan required the defendants to reduce the total Plan assets invested in the Company Stock Fund to 10%, or that the Company Stock Fund was an imprudent investment option.

**A.**

Fiduciaries under ERISA are those so named in the plan, or those who exercise fiduciary functions.  In re Lehman Bros. Secs. & ERISA Litig., 683 F. Supp. 2d 294, 298-99 (S.D.N.Y. 2010); see 29 U.S.C. § 1002(21)(A).  An action for a breach of ERISA fiduciary duty requires that the defendant "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." Fisher v. JP Morgan Chase & Co., 703 F. Supp. 2d 374, 381-82 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting Pegram v. Herdrich, 530 U.S. 211, 226 (2000)).  ERISA provides that a person is acting as a fiduciary to the extent that the person (1) "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or

control respecting management or disposition of its assets," (2)
the person "renders investment advice for a fee or other
compensation, direct or indirect, with respect to any moneys or
other property of such plan, or has any authority or
responsibility to do so," or (3) the person "has any
discretionary authority or discretionary responsibility in the
administration of such plan."  29 U.S.C. § 1002(21)(A); see also
Fisher, 703 F. Supp. 2d at 382.  Moreover, an ERISA fiduciary
"may wear different hats" and is not necessarily a fiduciary
whenever the person takes an action that affects plan
beneficiaries.  Pegram, 530 U.S. at 225.  Under the settlor
doctrine, actions taken pursuant to a person's settlor function
are not subject to challenge on the grounds of breach of
fiduciary duties.  See Hughes Aircraft Co. v. Jacobson, 525 U.S.
432, 444 (1999) (finding that employer's fiduciary duties
include administering plan assets but do not extend to decisions
concerning "the composition or design of the plan itself");
Lockheed Corp. v. Spink, 517 U.S. 882, 890 (1996) (explaining
that when plan sponsors act to adopt, modify, or terminate an
ERISA plan, they act as settlors of a trust and do not fall into
the category of fiduciaries).

        In this case, the Plan itself mandates that the "Trust
Fund shall consist in part of the Company Stock Fund."  (Compl.
Ex. B at § 6.2(a).)  The Plan documents do not grant the

22

defendants any discretion with regard to whether the Plan will offer a Company Stock Fund.  Because they have no discretion regarding the existence of the Company Stock Fund, the defendants are not liable for breaches of fiduciary duty with respect to whether the Company Stock Fund is maintained as part of the Plan.  Cf. Fisher, 703 F. Supp. 2d at 382 (finding Committee defendants to be ERISA fiduciaries when the Plan merely permitted offering company stock, but did not require it).

The plaintiffs argue that whether the defendants are fiduciaries is a question of fact that is not amenable to decision on a motion to dismiss.  See Frommert v. Conkright, 433 F.3d 254, 271 (2d Cir. 2006) (remanding to allow trier of fact to determine whether defendants acted in fiduciary capacity).  The plaintiffs also argue that the Trust Agreement for the Plan expressly granted the Investment Committee the "power and authority to invest, acquire, manage, vote proxies or dispose of the assets of the Trust Fund" and that this power includes management authority over the Company Stock Fund, and that the defendants exercised discretionary authority with regard to the Company Stock Fund.  (Compl. Ex. F. at § 4.2(a).)

However, the plaintiffs' argument simply misreads the Plan documents.  The Plan plainly requires the establishment of the Company Stock Fund, and the Trust Agreement grants the

Investment Committee management authority over Plan assets "[e]xcept for those Investment Funds that are specified in the Plan instrument," which includes the Company Stock Fund. (Compl. Ex. F. at § 4.2(a).)  When the Complaint alleges that all of the defendants are fiduciaries because they exercise the function of fiduciaries, that is a legal conclusion for which there is no plausible basis.  The Plan reflects that the investments in the Company Stock Fund are in fact mandatory. There is nothing pleaded that shows how the alleged fiduciaries could have exercised a discretionary function with respect to that requirement.  Indeed, the allegations of the Complaint are negative—that the defendants failed to act, or failed to remove the Company Stock Fund as an investment option.  This is not exercising a fiduciary function, and indeed that was following the requirements of the Plan.

Under the settlor doctrine, American Express did not act as a fiduciary when it designed the Plan terms to include the Company Stock Fund.  ERISA does not require an employer to provide an employee benefit plan in the first instance, or to provide a specific level of benefits.  See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1996).  The employer's fiduciary duty is "not implicated" when it "makes a decision regarding the form or structure of the Plan." Hughes Aircraft, 525 U.S. at 444.  Therefore, American Express cannot be liable

for establishing the Company Stock Fund or for failing to terminate it.

Moreover, the Committee defendants likewise exercised no discretionary authority with regard to the establishment or maintenance of the Company Stock Fund. The Administration Committee is a named fiduciary for plan administrative matters, but has no discretionary authority with regard to any investment decisions. The Compensation Committee's role is limited to appointing the Administration Committee and its fiduciary duty does not extend to investment decisions. See Gelardi v. Pertec Computer Corp., 761 F.2d 1323, 1325 (9th Cir. 1985) (per curiam) (finding that fiduciaries whose sole duty is to appoint plan administrators are only liable with respect to the appointment of those administrators). The Compensation Committee was solely responsible for appointing the Administration Committee, which itself was not responsible for investment decisions. Therefore, the Compensation Committee is not liable for Company Stock Fund investments. As discussed above, the Plan grants the Investment Committee management authority over Plan assets "[e]xcept for those Investment Funds that are specified in the Plan instrument," such as the Company Stock Fund. (Compl. Ex. F. at § 4.2(a).) The Investment Committee is likewise not liable for Company Stock Fund assets over which it had no management authority.

25

Judge Stein recently dismissed a similar complaint, finding that the defendants were not acting as fiduciaries when they had no discretion to eliminate a company stock plan from the investment options offered to plan participants. See In re Citigroup ERISA Litig., No. 07 Civ. 9790, 2009 WL 2762708, at *7-9 (S.D.N.Y. Aug. 31, 2009). Judge Stein also found that the defendants had no duty to override the terms of the plan. See id. at *10-13. This is particularly true when a fiduciary would risk liability if the fiduciary chose to override the plain terms of the plan. See id. at *13. The plaintiffs argue that the decision in Citigroup is wrong and on appeal, but the Court finds Citigroup to be on point and persuasive.[2]

The plaintiffs alleged for the first time at oral argument that the 2007 Plan amendment required the defendants to reduce the amount of Plan assets in the Company Stock Fund to 10% of the total Plan assets, and to reduce individual participants' investments in the Company Stock Fund to 10% of the

---

[2] The plaintiffs point to a recent decision in this District finding that a complaint survived a motion to dismiss when it alleged that the fiduciary defendants continued to invest in company stock, as mandated by the plan documents, when the company was vulnerable because ERISA requires fiduciaries to adhere to plan documents only insofar as they are consistent with fiduciary duties. In re Morgan Stanley ERISA Litig., 696 F. Supp. 2d 345, 357-58 (S.D.N.Y. 2009) (citing 29 U.S.C. § 1104(a)(1)(D)). However, Morgan Stanley relies in part on a rejection of the presumption of prudence at the motion to dismiss stage, a conclusion that is not well-founded, as explained below. See Morgan Stanley, 696 F. Supp. 2d at 358. Moreover, the allegations in Morgan Stanley included insufficient risk management, and an argument that the assets held in company stock amounted to "well over 50% of the Plans' total assets." Id. at 352-53. In this case, the assets in the Company Stock Fund were a significantly lower portion of the total Plan assets.

participants' individual total assets in the Plan.  The Court allowed the plaintiffs to amend the complaint to reflect this argument.  However, it is plain that the plaintiffs simply misread the 2007 Plan amendment.  The amendment prevents participants from making "future" or "ongoing contributions" in an amount greater than 10% of additional contributions to the Plan.  (Compl. Ex. B at § 6.3 & Ex. H at 6.)  The amendment also prohibits participants from transferring any amounts to the Company Stock Fund if the participant's aggregate contributions in the Company Stock Fund exceed 10% of the participant's Plan assets.  Participants were told that they need not "sell or transfer monies from the Fund," so long as future contributions adhered to the amendment's requirements.  (Compl. Ex. H at 6.) The amendment is plainly a restriction on participants' future transfers to the Company Stock Fund.  It does not require the Plan administrators to reduce immediately participants' contributions or the Company Stock Fund to 10%.  There is no basis to allege that the defendants breached their obligation to adhere to Plan requirements when the defendants failed to reduce assets in the Company Stock Fund to 10% of the Plan's total assets, because the Plan simply did not require them to do so.

**B.**

Even if the defendants were ERISA fiduciaries with discretionary authority with respect to the Company Stock Fund, the Court would not find that the defendants violated their duty to manage Plan assets prudently and loyally. Any such authority is governed by the presumption of prudence set out by the Court of Appeals for the Third Circuit in Moench v. Robertson, 62 F.3d 553 (3d Cir. 1995). In Moench the court held that "an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision." Id. at 571. This presumption may be overcome only by a showing of abuse of the fiduciary's discretion, which can be shown by evidence "that owing to circumstances not known to the settlor and not anticipated by him" the fiduciary "could not have believed reasonably that continued adherence to the ESOP's direction was in keeping with the settlor's expectations of how a prudent trustee would operate." Id. The court also cautioned that courts must recognize that a fiduciary who does not maintain an investment in an ESOP "may face liability for that caution, particularly if the employer's securities thrive." Id. at 571-72. To put it bluntly, if a fiduciary ignores a Plan's direction to invest in the employer's stock because it is depressed and sells the

28

employer's stock, the fiduciary may well be sued if the employer's stock rebounds.

To overcome the presumption of prudence, the plaintiffs must allege more than a drop in a company's stock price.  The plaintiffs must allege that the fiduciary knew of "an imminent corporate collapse" or other "dire situation to compel an ESOP sell-off."  In re Avon Prods., Inc. Secs. Litig., No. 05 Civ. 6803 (LAK)(MHD), 2009 WL 848083, at *11 (S.D.N.Y. Mar. 3, 2009) (internal citation omitted), report and recommendation adopted by, No. 05 Civ. 6803, 2009 WL 884687, at *1 (S.D.N.Y. Mar. 30, 2009); see In re Lehman Bros., 683 F. Supp. 2d at 302.

The presumption of prudence exists to advance the Congressional policy of promoting employee ownership of company stock.  Congress expressly exempted investments in employer securities from the diversification and prudence requirements of ERISA.  See 29 U.S.C. § 1104(a)(2); see also Steinman v. Hicks, 352 F.3d 1101, 1103 (7th Cir. 2003) (explaining that Congress encouraged ESOP's through tax breaks and waiving typical fiduciary duties because it believed "employees' ownership of the employer's stock a worthy goal").

While the Court of Appeals for the Second Circuit has not addressed the applicability of the Moench presumption, numerous courts in this District have adopted it.  See Gearren v. McGraw-Hill Cos., 690 F. Supp. 2d 254, 265 n.8 (S.D.N.Y. 2010)

(collecting cases).  Because Moench arose in the context of a summary judgment motion, some courts in this District have declined to apply the Moench presumption at the motion to dismiss stage.  See In re Morgan Stanley, 696 F. Supp. 2d at 358-59 (collecting cases).  However, other courts in this District have applied it to the motion to dismiss stage, particularly after the pleading standards explained by the Supreme Court in Twombly, 550 U.S. at 544.  See In re Citigroup, 2009 WL 2762708, at *15-16; see also In re Avon Prods., 2009 WL 848083 at *10.  The Court of Appeals for the Third Circuit itself applied the presumption of prudence to the motion to dismiss stage and found it dispositive when the complaint merely alleged stock fluctuations.  See Edgar v. Avaya, Inc., 503 F.3d 340, 349 (3d Cir. 2007).  As the Court of Appeals explained, "if a plaintiff does not plead all of the essential elements of his or her legal claim, a district court is required to dismiss the complaint pursuant to Rule 12(b)(6)."  Id.  Those cases applying the Moench presumption at the motion to dismiss stage are persuasive, particularly in light of the requirement that the plaintiff plead "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.

Indeed, this case is more amenable to a presumption of prudence than Moench itself.  The plan in Moench granted the defendants some discretion with respect to investment in company

30

stock, unlike the Plan at issue here.  See Moench, 62 F.3d at
567.  The Moench plan also invested nearly all of the
participant's assets in company stock, whereas in this case the
Plan expressly limits such investments to 10% of a participant's
contributions after the 2007 amendment.  The American Express
Plan was less dependant on company stock, and therefore more
diversified than the plan in Moench.

     The allegations in the Complaint are insufficient to
overcome the presumption of prudence in this case.  The
complaint alleges that the price of American Express stock
dropped 78% during the class period, but the company continued
to have earnings and income and the stock price has subsequently
rebounded significantly.  The price of the stock dropped, but it
did so along with the stock of other companies.  Layoffs of 10%
and accepting $3 billion in TARP funds are likewise not
indicative of financial collapse or other dire situation.  The
Court takes judicial notice of the fact that other companies
took such funds, including Citigroup, Goldman Sachs, and Morgan
Stanley.  These allegations do not amount to the financial
collapse that has been found in other cases where claims have
survived a motion to dismiss.  See, e.g., In re Polaroid ERISA
Litig., 362 F. Supp. 2d 461, 475 (S.D.N.Y. 2005) (denying motion
to dismiss when stock underwent "precipitous decline" in stock
price from $25.88 to $0.01 per share and defendants allegedly

31

knew about improper accounting practices); In re WorldCom, Inc., 263 F. Supp. 2d 745, 752, 764-65 (S.D.N.Y. 2003) (denying motion to dismiss when stock underwent "catastrophic" fall and company went bankrupt).

Rather, this case is more akin to the recent cases where the stock market plunge that generally depressed the stock prices of numerous companies was found to be insufficient to overcome the presumption of prudence in investing in a company's stock.  See, e.g., In re Wachovia Corp., 09 Cv. 262, 2010 WL 3081359 at *13-14 (W.D. N. Car., Aug. 6, 2010) (collecting cases) (87% decrease in stock value combined with alleged improper business and accounting practices insufficient to overcome presumption of prudence); In re Lehman Bros., 683 F. Supp. 2d at 302 (stock decline and $2.8 billion loss insufficient to show fiduciary knew that Lehman "was about to fold"); In re Citigroup, 2009 WL 2762708 at *18 (52% drop in stock price combined with allegations of a pattern of risky loan practices and losses of tens of billions of dollars insufficient to overcome presumption of prudence).

The Complaint does not allege sufficient facts to show that the defendants abused any duty with respect to the Company Stock Fund, and therefore the claims that the defendants violated their fiduciary duties under ERISA must be dismissed.  Counts I and II of the Complaint should therefore be dismissed.

32

IV.


Count III alleges that the defendants failed to inform Plan participants adequately about the alleged risks of the Company Stock Fund in violation of their duty to inform.  The plaintiffs argue that ERISA imposes a duty to disclose that is derivative of the fiduciary duties under § 404(a).  See 29 U.S.C. § 1104(a); Varity Corp. v. Howe, 516 U.S. 489, 506 (1996) ("To participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act solely in the interest of the participants and beneficiaries. . . .  Lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA.") (internal quotation marks omitted); see also Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 88 (2d Cir. 2001) (finding affirmative misrepresentations to plan participants violate ERISA fiduciary duties).

The defendants argue that the plaintiffs overstate their duties of disclosure under ERISA.  The statute imposes a "comprehensive set of reporting and disclosure requirements," Curtiss-Wright, 514 U.S. at 83 (internal quotation marks omitted) (citing 29 U.S.C. §§ 1021-31), and the Complaint does not allege any violations of these specific requirements.  See

33

also <u>Curtiss-Wright</u>, 514 U.S. at 84 ("This may not be a foolproof informational scheme, although it is quite thorough. Either way, it is the scheme that Congress devised.  And we do not think Congress intended it to be supplemented by a faraway provision in another part of the statute . . . .").

The alleged basis for the plaintiffs' non-disclosure claim is that the American Express SEC filings were incorporated by reference in the SPD and those filings failed to disclose material adverse financial information about American Express. Even if the disclosure requirements of ERISA go beyond the specific requirements of sections 1021-31, the requirement is no more than a duty to refrain from making affirmative misrepresentations to plan participants.  See <u>Varity Corp.</u>, 516 U.S. at 506 (finding affirmative deception to be a violation of ERISA section 404(a) fiduciary duties, but not reaching "the question whether ERISA fiduciaries have any fiduciary duty to disclose truthful information on their own initiative, or in response to employee inquiries"); <u>Devlin</u>, 274 F.3d at 88 (finding affirmative misrepresentations to plan participants violate ERISA fiduciary duties); see also <u>Gearren</u>, 690 F. Supp. 2d at 271 ("Defendants have no affirmative duty under ERISA to disclose information about the company's financial condition to plan participants."); <u>In re Citigroup</u>, 2009 WL 2762708, at *21 (citing <u>Bd. of Trs. of CWA/ITU Negotiated Pension Plan v.</u>

Weinstein, 107 F.3d 139, 147 (2d Cir. 1997)).  The Complaint alleges only that the SEC filings failed to disclose American Express's true financial outlook, but does not point to specific affirmative misrepresentations.

Moreover, the complaint fails to explain how the SEC disclosures or press releases were in fact false and misleading. The closest such allegation is that the press releases portrayed the company as "on track."  However, even those representations were not misleading because they were tied to economic conditions.  Indeed, American Express stated that it "remain[ed] on track" to meet growth predicted at the beginning of the year, "barring significant deterioration in the economic environment." (Compl. ¶ 139 (emphasis omitted).)

Moreover, the Complaint fails to show that the persons who signed the challenged SEC filings were the same persons who had the responsibility for the ERISA disclosures.  SEC filings do not violate ERISA disclosure obligations when the SEC filings and public announcements were not made in the defendants' capacity as ERISA fiduciaries.  See e.g., In re WorldCom, 263 F. Supp. 2d at 766 ("Those who prepare and sign SEC filings do not become ERISA fiduciaries through those acts, and consequently,

do not violate ERISA if the filings contain misrepresentations.").[3]

The plaintiffs have therefore failed to allege sufficient facts to show that the defendants breached any ERISA disclosure requirements.  Count III of the Complaint should therefore be dismissed.

**V.**


Count IV of the complaint alleges that American Express and the Monitoring Defendants failed adequately to monitor the Plan fiduciaries and failed to provide them with adequate information.  Appointing fiduciaries have the duty to monitor the fiduciaries they appoint.  See In re Polaroid, 362 F. Supp. 2d at 477 (collecting cases).  However, the duty to monitor can only be breached when there is an underlying act of imprudence or misconduct by those fiduciaries the Monitoring Defendants are charged with monitoring.  See In re Citigroup, 2009 WL 2762708, at *26.  Because the Complaint fails to plead a plausible claim

---

[3] The defendants also argue that the plaintiffs cannot, as a matter of law, show proximate causation because had the defendants notified participants that American Express was allegedly exposed to significant financial losses, this disclosure would have produced the very stock drop of which the plaintiffs complain.  The plaintiffs respond that proximate causation is an issue of fact that can only be determined after discovery.  In light of the above findings, the Court need not reach this argument.

of imprudence or misconduct, the claim for a breach of the duty to monitor cannot survive.

Similarly, the allegation that American Express and the Monitoring Defendants are liable for failing to provide the Committee Defendants with non-public information regarding American Express's financial position extends beyond the duties of American Express and the Monitoring Defendants under the Plan.  See id. (dismissing claim for failure to provide information when Monitoring Defendants were fiduciaries only to the extent that they appointed other fiduciaries); see also In re Bausch & Lomb Inc. ERISA Litig., No. 06 Civ. 6297, 2008 WL 5234281, at *11 (W.D.N.Y. Dec. 12, 2008) (finding no co-fiduciary liability when there was no underlying breach).

The plaintiffs have therefore failed to allege sufficient facts to state a claim for failure to monitor and failure to provide adequate information, and Count IV of the Complaint should be dismissed.


                                VI


Count V alleges that the Monitoring and Committee Defendants breached their duty to avoid conflicts of interest under ERISA sections 404 and 405.  See 29 U.S.C. §§ 1104(a)(1)(A) & 1105.  The plaintiffs argue that the Plan

fiduciaries placed their own interests above the interests of Plan participants.  However, the Complaint fails to explain the basis of any conflict of interest, and fails to set forth any facts to support this conclusory claim.  See In re Citigroup, 2009 WL 2762708, at *26-27 (dismissing conflict of interest claim that was not adequately explained in the complaint). Count V of the Complaint should therefore be dismissed.

### CONCLUSION

For the reasons stated above, the Complaint is **dismissed with prejudice**.

The Clerk is directed to enter judgment dismissing the Complaint and closing the case.

**SO ORDERED.**

**Dated:**     **New York, New York**
               **November 2, 2010**

_____
       **John G. Koeltl**
**United States District Judge**

fiduciaries placed their own interests above the interests of Plan participants.  However, the Complaint fails to explain the basis of any conflict of interest, and fails to set forth any facts to support this conclusory claim.  See In re Citigroup, 2009 WL 2762708, at *26-27 (dismissing conflict of interest claim that was not adequately explained in the complaint).  Count V of the Complaint should therefore be dismissed.

## CONCLUSION

For the reasons stated above, the Complaint is **dismissed with prejudice**.

The Clerk is directed to enter judgment dismissing the Complaint and closing the case.

**SO ORDERED.**

**Dated:**     **New York, New York**
        **November 2, 2010**

John G. Koeltl
United States District Judge

38